John MANGANARO, Administrator, Plaintiff, Appellant,

v.

The DELAVAL SEPARATOR CO. et al., Defendants, Appellees.

No. 6012.

United States Court of Appeals First Circuit.

Nov. 1, 1962.

**390**

Francis H. Farrell, Boston, Mass., for appellant.

John A. Mitchell, Portland, Me., with whom Roger A. Putnam and Verill, Dana Walker, Philbrick & Whitehouse, Portland, Me., were on brief, for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal by plaintiff-appellant from the district court's granting of defendants-appellees' motion for summary judgment in an action to recover damages for the death of plaintiff's intestate under the Maine Death Statute (Maine Revised Statutes 1954, Chap. 165, Secs. 9 and 10). Jurisdiction is based on diversity of citizenship.

The district court granted defendants' motion after a hearing in which the court determined that the pleadings, depositions and admissions on file in the case disclosed that there was no genuine issue as to any material fact and that the defendants were entitled to judgment as a matter of law. The court ruled for the defendants after finding that the plaintiff's decedent was guilty of contributory negligence as a matter of law.

The sole issue presented to us is whether the district court erred in this determination.

The facts disclose that while standing on the Maine Turnpike near his disabled automobile the decedent was killed by another automobile operated by one Gerald T. Hogan, a duly authorized agent of the corporate defendant, Delaval Separator Co. The accident was witnessed by Robert Carll. The depositions of Hogan and Carll constitute the principal evidence in the case. The fatal accident took place at approximately 11:45 a. m., January 20, 1961, on a southbound lane of the Maine Turnpike. A severe snowstorm was in progress and heavy gusts of wind, at times, severely impeded motorists' visibility.

The Maine Turnpike south is a three lane highway, consisting of a "breakdown" lane to the far right, a "travel" lane in the middle and a "passing" lane. At the time of the accident the evidence indicated that the breakdown lane was piled approximately two feet high with snow as a result of plowing, the travel lane was slippery and snow packed and the passing lane had not been fully plowed. The center strip between the northbound lanes and southbound lanes was piled with snow to a height of four or five feet, and the snow from it was jutting out on to the passing lane so that a portion of the passing lane was blocked with snow. The deposition of Carll indicated that following the accident, the turnpike was closed to traffic because of poor travelling conditions.

Although the cause is not clear from the record, the decedent's car had become disabled and stalled. It rested on the highway in a position in which three-fourths of the car was located in the

travelling lane and the remaining front quarter was in the breakdown lane at an angle pointing slightly south.

Carll, at the time of the accident, an attendant in a nearby service station, testified that as he was driving along the turnpike he saw the decedent's car. After negotiating his way past the car and noting its obvious distress, he pulled his own car over to the right-hand side of the turnpike and walked back to the decedent's car to ascertain whether he could be of assistance.

Decedent was sitting in his automobile —the motor off and the radio playing. Carll told the decedent that he should get out of the car because it was in a dangerous position. When decedent got out of his car, Carll told him that he would see if he could get it started. Carll suggested to him that while he was working on the vehicle decedent could sit in Carll's car which was then parked some one hundred to one hundred and twenty-five feet down the turnpike. Unable to start the engine Carll went to the right front (or passenger) side, opened the hood and attempted to dry out the ignition wires which were covered with snow. While working under the hood, Carll stated that he looked up and saw the decedent standing beside his [decedent's] car by the rear tire on the passenger side. He stated that decedent was standing erect and was facing in a southerly direction towards the car with his back to the flow of traffic. Carll indicated that decedent did not appear to be engaged in any activity. He warned the decedent to move "because he was in a dangerous position there."

A short time later Carll looked up again and saw that the decedent was in the same position as he had seen him previously—that is, opposite the right rear tire standing erect, facing south with his back toward the oncoming traffic. At the same time Carll saw Hogan's car come out of the snow. Anticipating that there was to be a collision, Carll shouted a warning to the decedent and jumped back free of the car into a snowbank. The Hogan car struck the decedent, killing him instantly and also struck decedent's car.

The pertinent portion of Carll's deposition concerning the point of impact showed that the decedent's position remained unchanged.

"Q. When the Ford came into contact with the Manganaro car, where was Paul Manganaro with relation to his own car? A. He was standing right by that right rear tire.

"Q. Where he had been before? A. Yes.

"Q. Can you tell us which direction he was facing? A. He was facing south.

"Q. Facing south? A. Yes."

In his deposition Hogan stated that as he came upon the scene of the accident proceeding in the travel lane, he saw the decedent's car blocking most of the lane and that decedent was standing at the left rear of the car and behind it—close to the left rear bumper. Although Hogan could not testify in which direction the decedent was facing, he did state that he was standing motionless. Hogan stated that he applied his brakes swerving the car about sharply in the attempt to avoid hitting the decedent. However his efforts were unavailing.

■ In considering the correctness of the grant of a motion for summary judgment we must of course view the evidence in the light most favorable to the party against whom the motion has been granted, according that party the full benefits of all favorable inferences that may be drawn from the evidence. Brantley v. Skeens, 105 U.S.App.D.C. 246, 266 F.2d 447, 454 (1959); Kaufman v. Western Union Telegraph Company, 224 F.2d 723, 727 (5 Cir., 1955), cert. den., 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956); Caylor v. Virden, 217 F.2d 739, 741 (8 Cir., 1955); Dulansky v. Iowa-Illinois Gas & Electric Co., 191 F.2d 881, 884 (8 Cir., 1951). Applying this rule, we thus test the record to determine whether

it supports the district judge's conclusion that decedent was *guilty of contributory negligence* as a matter of law.

■ Under the pertinent Maine statute, in actions to recover damages for negligently causing the death of a person or for injuries to a person who is deceased at the time of trial, the decedent is presumed to have been in the exercise of due care and the burden of proof of contributory negligence is upon the defendant. O'Connell v. Hill, 157 Me. 57, 170 A.2d 402 (1961). Maine Rules of Civil Procedure 8(c). However, it has been held that where the plaintiff's evidence shows contributory negligence attributable to the deceased, then the defendant has sustained his burden. Binette v. LePage, 152 Me. 98, 123 A.2d 771 (1956).

■ We believe that the evidence clearly shows contributory negligence on the part of the decedent. The familiar principle is to determine whether or not the decedent acted as a reasonably prudent man under all the circumstances. Here the decedent could observe that his stalled car was virtually blocking the normal travel lane of the turnpike. He could observe the windblown snow and either could or should have made the judgment that the severe weather conditions would predictably reduce the vision of oncoming traffic. Notwithstanding the obvious and significant danger quotient of the situation in which he thus found himself, decedent placed himself at the rear of his vehicle in a zone of maximum vulnerability and then turned his back on the oncoming traffic. Moreover he stood fast in this perilous position despite the warning of Carll for him to move. We do not believe that decedent's actions were those of the reasonably prudent man under the circumstances here present.

Plaintiff contends that the district court's action, in effect, established the rule that mere presence on a public highway constitutes contributory negligence. This he argues is not the law of Maine. We agree with the plaintiff that such is not the law of Maine but we do not believe that the district judge's ruling is to be read to this effect. Rather, in support of its action, the court below relied on the case of Tibbetts v. Dunton, 133 Me. 128, 174 A. 453 (1934). In this case the plaintiff had a flat tire on a public road. He was subsequently injured while changing the tire by an oncoming car. In the course of its opinion the Maine Supreme Court discussed the question of whether the plaintiff's presence on the highway while changing the tire constituted contributory negligence as a matter of law and whether it was incumbent on the plaintiff to remove his vehicle from the highway before proceeding to repair the tire. The court answered both of these questions in the negative. However, it then went on to overturn a jury verdict for the plaintiff on the ground that the licitness of his presence did not insulate him from exercising a vigilance commensurate with the inherent risks of the situation in which he found himself.

"* * * Even though he had the right to change this tire there on the highway, would he recover for injuries received while so doing, he must at the time himself have been in the exercise of due care in the performance of his work. The right to stop for a reasonable length of time to do reasonably necessary work on the automobile does not relieve one from the duty of exercising due care for his own safety, while so engaged.

"A careful reading of the record, particularly the evidence of the plaintiff himself, convinces us that instead of proving due care while changing this tire, he clearly demonstrated his lack of it. In the observance of due care he was bound, would he not have been contributorily negligent, to do for his own safety that which the ordinarily careful and prudent person would have done under the same circumstances. The vigilance of such a person he must have exercised in his own behalf, and it should have been 'commensurate with the dangers arising from a lack of it.' Aiken v. Metcalf, 90 Vt. 196, 97 A. 669, 670; Day v. Cunningham, 125

Me. 328, 330, 133 A. 855, 47 A.L.R. 1229. The greater the danger, correspondingly greater is the vigilance required. * * * " Id., 174 A. at 455.

In the case at bar it is clear that the district judge did not predicate his finding of contributory negligence on the mere presence of the decedent on the highway. The district judge undoubtedly assumed—as do we—that a person who finds himself marooned in a dangerous position on a public highway should not—by this very fact—be barred from recovery for any untoward circumstances which may proximately derive from the event. Nonetheless, the person so situated must assuredly adopt reasonable measures to insulate himself from the dangers attendant upon his then present position. And, again, "The greater the danger, correspondingly greater is the vigilance required."

Here the danger inherent in decedent's position was very great. Indeed, his physical position adjacent to the stalled vehicle in the middle of the travel lane, the vagaries of the swirling snow and the constrictions of impaired visibility adduced a situation fraught with danger of the sternest magnitude. If "Danger invites rescue," Wagner v. International R. Co., 232 N.Y. 176, 133 N.E. 437, 19 A.L.R. 1 (1921), so does it invite vigilance, and here the invitation was assuredly declined as the decedent, after placing himself in a position of maximum danger at the rear of the car, turned his back on approaching traffic and became apparently oblivious of it.

Invoking the concededly pertinent principle that the decedent is to have the full benefit of all favorable inferences growing out of the evidence, plaintiff argues that the decedent's conduct could be justified as reasonable under two hypotheses. First, plaintiff contends that the decedent could be found to have gone to the rear of the car in order to pry loose a fender which was stuck against a rear wheel. This position is grounded on the premise that the reason that the decedent's car was initially stalled was that it had been in a prior mishap resulting in the crushed fender. Apart from a photograph of ambiguous probative worth, there is nothing in the record to support plaintiff's assumption in this regard. Passing the point, however, the evidence is clear that if the decedent went to the rear of his car in the attempt to ameliorate its physical condition, his activities while there assuredly belied this intention. Carll was unequivocal in his testimony that when he first looked up while working under the hood of the car, the decedent was standing erect beside his car; that he was "standing up straight" and was not "doing anything," and that "he was standing up, not leaning over." Shortly thereafter, when he looked up again decedent was still "standing straight up, not leaning over." In short, the only evidence as to decedent's conduct at the rear of the car was that he was standing up doing nothing.

Secondly, plaintiff argues that we should indulge the assumption that decedent went to the rear of the car in the attempt to warn oncoming traffic. No such inference arises where the only testimony is that decedent had his back to oncoming traffic at all observable times. Moreover, to be meaningful, under the circumstances of the snow storm, the warning would have to be given before an approaching motorist was upon the disabled car. But here, both Carll and Hogan placed the decedent almost immediately adjacent to the car. When the approaching motorist saw the car he might also see the decedent but by then, as this case so tragically illustrates, it would have been too late.

In sum, while we believe that the plaintiff is entitled to all favorable inferences, he is not entitled to build a case on the gossamer threads of whimsy, speculation and conjecture. Such would be necessary were we to overturn the decision of the district court.

A judgment will be entered affirming the judgment of the district court.