**Chester V. SHEA and Barbara A. Shea, Plaintiffs,**

v.

**KEUFFEL & ESSER OF NEW JERSEY, INC., Defendant.**

**Civ. A. No. 85–0061–W.**

United States District Court, D. Massachusetts.

July 14, 1986.

42

Chester V. Shea, III, Wayland, Mass., for plaintiffs.

Peter M. Durney, Karl L. Gollub, Hugh M. Coxe, Cornell & Gollub, Richard McCarthy, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Plaintiff Chester V. Shea, an architect, and his wife, Barbara A. Shea, have brought this products liability action for negligence and breach of warranty against defendant Keuffel & Esser of New Jersey, Inc. ("K & E"). The Sheas claim that a special paper manufactured by K & E for architectural work caused Chester Shea to suffer a severe skin disorder. They seek damages for Mr. Shea's personal injuries and Mrs. Shea's loss of consortium. Jurisdiction rests on diversity of citizenship. 28 U.S.C. § 1332. K & E has brought a motion to dismiss under Fed.R.Civ.P. 12(b)(6), or for summary judgment under Fed.R. Civ.P. 56, claiming that the Sheas' action is barred by the applicable statutes of limitation. *See* Mass.Gen.Laws c. 260, § 2A (three-year statute of limitations for negligence), and c. 106, § 2–318 (three-year statute of limitations for breach of warranty). The Sheas oppose the motion to dismiss or for summary judgment. The parties have filed memoranda, affidavits, depositions, and various exhibits. Consequently, the court will treat K & E's motion as one for summary judgment. *See* Fed.R.Civ.P. 12(b) (motion to dismiss under Rule 12(b)(6) shall be treated as one for summary judgment under Rule 56 when matters outside the pleadings are presented to and not ex-

cluded by the court). On March 20, 1986, the court heard oral argument on K & E's motion. It has since again searched the record to determine, among other things, whether this motion presents any genuine dispute concerning a material fact.

For the reasons set forth below and based on the relevant facts which the evidence presented does not place in dispute, the court concludes that the Sheas' claims are barred by the Massachusetts statutes of limitations. K & E's motion for summary judgment is therefore allowed.

### I. *Facts*

Unless otherwise specified, the following facts are, as a matter of law, undisputed.[1] Chester Shea is an architect. He worked for two different architectural firms from 1974 to 1982. In March of 1974, at the age of 51, he began experiencing severe skin eruptions. He consulted Dr. Walter Flannagan who prescribed various medicated lotions and creams for Mr. Shea's irritated skin. Based on Dr. Flannagan's recommendation, Mr. Shea went to see Dr. Lawrence Fitzpatrick in April of 1974. Dr. Fitzpatrick diagnosed Mr. Shea's skin condition as eczematous dermatitis. Mr. Shea also had hypertension and a duodenal ulcer.

Up to this point, Mr. Shea's skin condition had affected nearly every part of his body at one time or another. He suffered from disfigurement, cuts, bruises, bumps, and constant itching.

In June of 1974, Dr. Fitzpatrick conducted further tests that confirmed that Mr. Shea was suffering from eczematous dermatitis, but did not clarify the cause of his condition. Indeed, Mr. Shea's medical records include a note by one of his examining physicians declaring "a prize for the man who finds this allergen."

From September, 1974 to April, 1980, Mr. Shea underwent numerous tests and treatments for his skin disorder, many of which were quite painful. Several different doctors treated him during this period, but

1. This rendition of Mr. Shea's medical history is derived largely from Addendum I to Plaintiffs' Answer to Defendant's Interrogatories attached as Exhibit B to Defendant's Memorandum in Support of Its Motion to Dismiss or for Summary Judgment.

none was able to identify the cause of his condition.

In April, 1980, Mr. Shea began a series of photopatch tests under the supervision of Dr. Ernesto Gonzalez, Chief of Dermatology Associates II at the Massachusetts General Hospital. The purpose of these tests was to identify the precise chemical substance or substances that were causing his condition. The process requires patches containing various chemical substances to be applied to the patient's skin. The doctors then evaluate the patient's reaction to the patches and determine whether he is allergic to the substances tested.

After one year of testing, and after having eliminated all other possible allergens, Dr. Gonzalez asked Mr. Shea to bring in samples of the different types of paper he used at the architectural firm where he was employed.[2] In April, 1981, Mr. Shea was patch tested with xerox paper, printing paper, sepia paper, and various other types of paper from his work place. He reacted positively to the sepia paper. At this point, Dr. Gonzalez informed Mr. Shea that Mr. Shea was allergic to the sepia paper he used at work. Deposition of Dr. Ernesto Gonzalez at 34, 40 (August 22, 1985) (hereinafter cited as "Gonzalez Dep.").

In August, 1981, Dr. Gonzalez contacted defendant K & E, the manufacturer of the sepia paper that Mr. Shea used in his architectural office, and asked the company to identify the chemicals contained in the sepia paper. Gonzalez Dep. at 40–41. Based on the list of chemicals identified, Dr. Gonzalez asked K & E to send him samples of diazonium compound. On August 5, 1981, Mr. Shea was patch tested for diazonium compound. The record does not reflect the results of that test.

On October 23, 1981, Mr. Shea was admitted to Massachusetts General Hospital for ultraviolet box tests, as well as further patch testing. An ultraviolet box test determines a person's sensitivity to light after it has passed through a chemical substance. Here, Dr. Gonzalez tested Mr. Shea's photosensitivity to ultraviolet light as it passed through paper treated with diazonium compound. Gonzalez Dep. at 28.

According to plaintiffs' answers to interrogatories, on October 30, 1981, Mr. Shea was discharged "with a diagnosis of photosensitivity and reaction to diazonium compound which confirmed that the skin eruptions were produced by exposure to the diazonium compound contained in the paper he used at work." Addendum I to Plaintiff's Answers to Defendant's Interrogatories (hereinafter cited as "Addendum I") attached as Exhibit B to Defendant's Memorandum in Support of Its Motion to Dismiss or for Summary Judgment. Likewise, Dr. Gonzalez testified that he was certain as of October, 1981, that the diazonuim compound in the sepia paper had been causing Mr. Shea's skin condition. Gonzalez Dep. at 38–41, 43–44. The Sheas claim that Dr. Gonzalez was not certain of the cause of Mr. Shea's condition until at least March, 1982.

According to Dr. Gonzalez, he not only discussed the results of the October, 1981 tests with Mr. Shea at the time of his discharge, *id.* at 38, 40–41, 44, but also advised Mr. Shea at that time that Mr. Shea should not continue to expose himself to the sepia paper he was using at work, *id.* at 42. At the March 20, 1986 hearing on K & E's motion to dismiss or for summary judgment, counsel for the Sheas suggested for the first time that Dr. Gonzalez did not inform Mr. Shea about the results of the October, 1981 tests until January, 1982. The Sheas further contend that Dr. Gonzalez did not advise Mr. Shea to stop working until January, 1982. *See* Addendum I.

On January 22, 1982, Mr. Shea took a leave of absence from his job. His skin condition improved considerably over the next two months. On March 22, 1982, Dr. Gonzalez wrote a general letter certifying that Chester Shea had a severe case of

---

**2.** Dr. Gonzalez testified that he asked Mr. Shea to bring in samples of the paper he used at work not only because all other possible allergens had been tested, but also because Mr. Shea's medical history indicated that his condition improved dramatically when he was away from work for substantial periods of time. Deposition of Dr. Ernesto Gonzalez at 26–27 (August 22, 1985).

eczematous dermatosis that "seems to be produced or exacerbated by exposure to chemicals in the photocopying paper he uses at work." *See* Exhibit I to Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss or for Summary Judgment (hereinafter cited as "Plaintiffs' Memorandum"). In that letter Dr. Gonzalez recommended that Mr. Shea retire from his position as an architect. Dr. Gonzalez issued an identical letter on February 16, 1983. *Id.* He wrote a third letter on December 27, 1983. *Id.* This last letter contained more certain language regarding the cause of Mr. Shea's skin condition. It reads:

> Mr. Shea has been patch tested and found allergic to chemicals used in his occupation. To avoid repeated hospitalizations, I have advised him to retire from his present position. He will remain in remission as long as he has no contact with the chemicals. Any attempts to use them will cause an immediate and serious flare of his skin.

*Id.*

Mr. Shea did not return to work as an architect. On January 4, 1985, the Sheas filed their complaint in this action.

## II. *Conclusions of Law*

K & E has filed a motion to dismiss or for summary judgment on grounds that the Sheas' claims are barred by Massachusetts three-year statutes of limitation for tort claims, Mass.Gen.Laws c. 260, § 2A, and breach of warranty claims, Mass.Gen.Laws c. 106, § 2–318, respectively. K & E argues that the undisputed facts demonstrate that the Sheas knew or should have known as early as April, 1981, and no later than October, 1981, that K & E's sepia paper was a likely cause of Mr. Shea's skin disorders. It further argues that once on notice of the probable cause of Mr. Shea's condition, plaintiffs had three years in which to investigate and file their claim against K & E. *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 199 (1st Cir.1983). According to K & E, the applicable statutes of limitations expired at least two months before the Sheas filed their action. The Sheas respond that they were not on notice of the

cause of Mr. Shea's condition until at least March, 1982, after Mr. Shea had been away from his job for two months. For the reasons stated below, the court concludes that the Sheas' claims are barred by the Massachusetts statutes of limitations.

### A. *Summary Judgment Standard*

As a threshold matter, the court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56(c), the court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In addition, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Transportation Corp.*, 722 F.2d 922, 928 (1st Cir.1983) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)). However, to survive a summary judgment challenge on the basis of disputed material facts, the plaintiff must produce substantial evidence, going beyond the allegations of the complaint and supporting the claimed dispute, which would require a judge or jury to resolve the conflicting versions of the truth at trial. *Hahn*, 523 F.2d at 464.

### B. *Statutes of Limitations: The Discovery Rule*

Statutes of limitation represent a legislative decision to restrict the amount of time that a plaintiff may wait to file suit after his cause of action accrues. The Supreme Court discussed the policy rationale for statutes of limitations in *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), a case involving the statute of limitations for the Federal Tort Claims Act:

> Statutes of limitations, which "are found and approved in all systems of enlight-

ened jurisprudence," *Wood v. Carpenter*, 101 U.S. 135, 139, 25 L.Ed. 807 (1879), represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that "the right to be free of stale claims in time comes to prevail over the right to prosecute them" *Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944). These enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise. (Citations omitted).

Section 2401(b), the limitations provision involved here, is the balance struck by Congress in the context of tort claims against the Government; and we are not free to construe it so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims.

*Id.* at 117, 100 S.Ct. at 357. *See also Olsen v. Bell Telephone Laboratories, Inc.*, 388 Mass. 171, 175, 445 N.E.2d 609 (1983) ("Statutes of limitations are 'vital to the welfare of society.... they promote repose by giving security and stability to human affairs....' [and] 'encourage plaintiffs to bring actions within prescribed deadlines when evidence is fresh and available.'" (Citations omitted.))

■ State statutes of limitations apply to cases brought in federal court on the basis of diversity jurisdiction. *Guaranty Trust Company of New York v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). *See generally Buckley v. American Honda Motor Corp.*, 780 F.2d 1 (1st Cir.1985); *Fidler*, 714 F.2d 192 (1st Cir.1983). As previously noted, two Massachusetts statutes of limitations govern the Sheas' claims: the three-year statute of limitations for negligence claims, Mass.Gen.Laws c. 260, § 2A,[3] and the three-year statute of limitations for breach of warranty, Mass. Gen.Laws c. 106, § 2–318.[4] The time at which the statute of limitations begins to run is a question for the court. *Olsen v. Bell Telephone Laboratories, Inc.*, 388 Mass. 171, 175, 445 N.E.2d 609 (1983); *White v. Peabody Construction Co.*, 386 Mass. 121, 128, 434 N.E.2d 1015 (1982). In addition, plaintiffs have the burden of proving facts that show their claims are not barred by the statutes of limitations. *Franklin v. Albert*, 381 Mass. 611, 619, 411 N.E.2d 458 (1980).

In determining when a plaintiff's cause of action accrued in actions in which the plaintiff has contracted an occupational disease through the negligence of another, Massachusetts courts apply the so-called "discovery rule." *Olsen*, 388 Mass. at 175, 445 N.E.2d 609. Moreover, the First Circuit Court of Appeals has held that "the Supreme Judicial Court of Massachusetts would [also] apply the discovery rule to a products liability action ... brought under ... a breach of warranty theory." *Fidler*, 714 F.2d at 197. Therefore, the discovery

---

**3.** The statute of limitations for negligence claims reads as follows:

Except as otherwise provided, actions of tort, actions of contract to recover for personal injuries, and actions of replevin, shall be commenced only within three years next after the cause of action accrues.

Mass.Gen.Laws c. 260, § 2A.

**4.** The statute of limitations for breach of warranty claims is contained in the general provision for warranty actions:

Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty, express or implied, or for negli-

gence, although the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier might reasonably have expected to use, consume or be affected by the goods. The manufacturer, seller, lessor or supplier may not exclude or limit the operation of this section. Failure to give notice shall not bar recovery under this section unless the defendant proves that he was prejudiced thereby. *All actions under this section shall be commenced within three years next after the date the injury and damage occurs.* Mass Gen.Laws c. 106, § 2–318 (emphasis added).

rule governs the Sheas' negligence and breach of warranty claims.

Under the discovery rule, a plaintiff's cause of action does not accrue until he knows or reasonably should have known that he was injured as a result of the defendant's conduct. *Olsen*, 388 Mass. at 175, 445 N.E.2d 609. The plaintiff need not know the full extent of his injury or that the defendant is legally responsible. *Fidler*, 712 F.2d at 199. He need only be on notice that he has been harmed by the defendant's product. *Id.; Franklin*, 381 Mass. at 612, 411 N.E.2d 458 (medical malpractice case).

In addition, plaintiff's cause of action ordinarily accrues when he is on notice of the *likely*, rather than *definite*, cause of his injury. *Fidler*, 714 F.2d at 199. *See also White*, 386 Mass. at 130, 434 N.E.2d 1015 ("The 'notice' required is not notice of every fact which must eventually be proved in support of the claim. These details are properly the subject of requests for discovery once an action is filed."). In *Fidler*, a products liability action involving the question of when the plaintiff was on notice of the cause of her crushing facial and head pains, the First Circuit Court of Appeals said:

> We think that under Massachusetts law notice of *likely* cause is ordinarily enough to start the statute running.

Thus on notice, the potential litigant has the duty to discover from the legal, scientific, and medical communities whether the theory of causation is supportable and whether it supports a legal claim. Thus on notice, his cause of action is no longer inherently unknowable. He is in the same position as other tort plaintiffs who must determine whether the harm they have suffered is legally compensable. He has three years to do so.

*Fidler*, 714 F.2d at 199 (emphasis added).[5]

With these principles in mind, the court applies the discovery rule to the facts presented in this case.[6]

## C. Discovery Rule Applied to Plaintiffs' Claims

■ The statutes of limitations will bar the Sheas' claims if they knew or should have known on or before January 4, 1982, that the paper manufactured by K & E was the likely cause of Chester Shea's skin disorder. The facts, undisputed by the evidence presented, show that the Sheas were on notice as early as April, 1981 that Chester Shea was allergic to the sepia paper that he used at work. By August 5, 1981, the Sheas knew (a) that K & E manufactured the sepia paper with which Chester Shea had been working over the previous decade and (b) that such paper contained diazonium compound. By October 30,

---

**5.** In *Fidler*, the First Circuit also quoted language from a Supreme Court decision on the operation of the discovery rule in the context of medical malpractice claims under the Federal Tort Claims Act:

> "A plaintiff ... armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community.... If advised that he has been wronged, he may promptly bring suit. If competently advised to the contrary, he may be dissuaded, as he should be, from pressing a baseless claim. Of course, he may be incompetently advised or the medical community may be divided on the crucial issue of negligence, as the experts proved to be on the trial of this case. But however or even whether he is advised, the putative malpractice plaintiff must determine within the period of limitations whether to sue or not, which is precisely the judgment that other tort claimants must make."

*Fidler*, 714 F.2d at 199 (quoting *United States v. Kubrick*, 444 U.S. 111, 123–24, 100 S.Ct. 352,

360, 62 L.Ed.2d 259 (1979)). This principle is also applicable in the instant action.

**6.** The Massachusetts Supreme Judicial Court has held that, for statute of limitations purposes, the accrual date of a spouse's claims for loss of consortium must be considered separately from that of the injured plaintiff's negligence and breach of warranty claims. *Olsen*, 388 Mass. at 176–77, 445 N.E.2d 609. Neither party has raised this issue here. Nor have the Sheas offered any evidence to indicate that Mrs. Shea was not kept up to date on the information Mr. Shea received from Dr. Gonzalez. The court therefore assumes that the parties agree that Mr. and Mrs. Shea's claims accrued at the same time. Thus, if Mr. Shea's claims are barred by the statutes of limitations, Mrs. Shea's claims are also barred for Mrs. Shea has not borne her burden of proving her claim accrued materially later than Mr. Shea's claims. *Franklin*, 381 Mass. at 619, 411 N.E.2d 458.

1981, the Sheas knew or should have known that Chester Shea was allergic to the diazonium compound found in K & E's sepia paper and that this chemical was the likely cause of his skin condition.

Plaintiffs' answers to interrogatories state that in April, 1981, patch testing was done with the paper Mr. Shea used at work because the doctors had eliminated all other possible allergens that could have been causing his condition. Addendum I. In addition, Dr. Gonzalez testified that he suspected that something at Mr. Shea's office was causing his skin condition because it improved when Mr. Shea was away from work for extended periods of time. Gonzalez Dep. at 26–27. Dr. Gonzalez further testified that after the April, 1981 patch tests, he knew that Mr. Shea was allergic to something in the sepia paper he used at work and notified Mr. Shea of these findings. *Id.* at 34, 40. By October 30, 1981, Dr. Gonzalez was sure that the diazonium compound in the sepia paper was responsible for Mr. Shea's skin condition. *Id.* at 38–41, 43–44. He testified repeatedly that he communicated these findings to Mr. Shea. *Id.* Finally, plaintiffs themselves, in their answers to interrogatories, stated that the results of the October, 1981 tests "confirmed that [Chester Shea's] skin eruptions were produced by exposure to the Diazonium Compound contained in the paper he used at work." Addendum I.

These facts, which have not been contradicted by any evidence in the record, compel the conclusion that plaintiffs knew or should reasonably have known as early as April, 1981, and no later than October 30, 1981, that the sepia paper manufactured by K & E and used by Chester Shea at work, was a likely cause of his skin disease. Thus on notice, the Sheas had three years to investigate and file their claim against K & E. *Fidler*, 714 F.2d at 199.

The Sheas make several arguments which, although initially appealing, are ultimately unpersuasive. Their first contention is that given Mr. Shea's excruciating medical history, they could not reasonably have known that the sepia paper had caused Chester Shea's disease until he had been out of work for several months, causing a dramatic improvement in his condition. According to the Sheas, reasonable and prudent people in their positions, after going through seven years of painful tests, and after receiving numerous conflicting and inaccurate diagnoses of the cause of Chester Shea's condition, would not have

believed that the sepia paper was a likely cause of his disease until they had the extra proof provided by his leave of absence in early 1982. The Sheas further argue that to file a lawsuit based on the test results, without the evidence provided by the leave of absence, would have been imprudent and irresponsible. The Sheas also claim that Dr. Gonzalez's affidavit of July 10, 1985, indicates that he was not sure of his diagnosis until March of 1982. In fact, they assert that the three general letters that Dr. Gonzalez wrote on Chester Shea's behalf demonstrate that Dr. Gonzalez was not really sure that the sepia paper was the cause of Chester Shea's disease until December, 1983. Finally, at the March 20 hearing, counsel for the Sheas argued for the first time that Dr. Gonzalez did not inform Mr. Shea of the results of the October, 1981 tests until mid-January, 1982. The Sheas contend therefore that they could not have known that the sepia paper had caused Mr. Shea's condition until at least mid-January, 1982, in which case the statutes of limitation would not bar their claims. At a minimum, they claim that summary judgment is inappropriate on the statute of limitations question because there is a disputed material fact as to when Dr. Gonzalez told Mr. Shea of the results of the October, 1981 tests.

The Shea's claims misconstrue the nature of the discovery rule and the operation of the statutes of limitation. Those claims are also unsupported by the material facts, which are uncontradicted by the evidence presented.

The court is sensitive to the hardship that the Sheas suffered in trying to discover the cause of Chester Shea's disease and accepts that after so many incorrect diagnoses, they may have been initially reluctant to believe they had finally discovered the true cause of Mr. Shea's condition. This might justify a finding that they were not on notice of the likely cause of Mr. Shea's condition in April, 1981, when Dr. Gonzalez told Mr. Shea he was allergic to the sepia paper he used at work. Plaintiffs' answers to interrogatories, however, state that the October, 1981 tests "confirmed" that the sepia paper caused Chester Shea's condition. In addition, Dr. Gonzalez repeatedly testified that he was convinced by these test results that Chester Shea's disease was caused by the paper he used at work, and that he communicated this conviction to Mr. Shea. Gonzalez Dep. at 38–44.

Even viewing the record in the light most favorable to the Sheas, their claim is, in essence, that because of the protracted and painful nature of Mr. Shea's medical history, they were entitled to extra time to verify the cause of Mr. Shea's disease before their cause of action accrued. This contention, however, is incorrect. The discovery rule does not toll the statute of limitations while the plaintiff seeks to satisfy himself that he has found the definite cause of his injury. Rather, as stated above, the statutes of limitation begin to run when a possible plaintiff is on notice of the *likely* cause of his illness. *Fidler*, 714 F.2d at 199.

■ Here, the uncontradicted evidence demonstrates that the Sheas were on notice no later than October, 1981 that the sepia paper manufactured by K & E was the likely cause of Chester Shea's disease. From that point, the Sheas had three years to convince themselves that the paper was definitely the cause of Mr. Shea's condition and to perfect their claim against K & E. *Id.* In effect, the Sheas did investigate their claim, for Mr. Shea took a leave of absence from work to verify whether the October, 1981 tests had in fact identified the true cause of his disease. By their own admission, as of March of 1982, the Sheas were positive that the sepia paper manufactured by K & E had caused Mr. Shea's condition; thus Mr. Shea underwent no further tests. Plaintiffs Memorandum at p. C11. Under the discovery rule, they then had until October 30, 1984, or more than two and one half years, to file their complaint without losing their cause of action.

Contrary to the Sheas' position, this is not a case in which they were required to file a complaint based on pure speculation or conjecture. First, this action is not a case in which breakthroughs in medical knowledge were necessary before the Sheas could discover the cause of Mr. Shea's illness. *Fidler*, 714 F.2d at 200. Rather, it is a case in which well-established, although arduous, tests were used to discover the cause of Mr. Shea's condition through a process of elimination. Second, it is also not a case in which more than three years passed from the time the plaintiffs were on notice of *likely* cause of Mr. Shea's condition, and the time they had satisfied themselves of the *definite* cause. Here, the Sheas admit that they were able to confirm the cause of Mr. Shea's illness within five months of the date on which they had notice of the likely cause of his condition. *Compare Fidler*, 714 F.2d at 195 (plaintiff argues that she did not learn the cause of her illness until after she filed her complaint, more than three years after the date on which the court determined that she had notice of the *likely* cause of her conditions. *See also* note 9, *infra.*)

The Sheas' argument regarding the strength of Dr. Gonzalez's convictions is also unpersuasive. Dr. Gonzalez's deposition testimony of August 22, 1985 indicates unequivocally that he was confident as of October 30, 1981 that K & E's sepia paper had caused Chester Shea's disease and that he communicated that conclusion to Mr. Shea. Gonzalez Dep. at 38–41, 43–44. However, the Sheas contend that Dr. Gonzalez's deposition testimony should be disregarded because in his earlier affidavit of July 10, 1985, he stated that it was not until March, 1982 that he was able "to positively confirm" that the sepia paper had caused Mr. Shea's skin condition based on the results of the October, 1981 tests *and* Chester Shea's leave of absence. *See* Affidavit of Dr. Ernesto Gonzalez (July 10, 1985) attached as Exhibit I to Plaintiff's Memorandum. Dr. Gonzalez subsequently testified, however, that he did not prepare the affidavit and paid little attention to the dates when he signed it. Gonzalez Dep. at 53–54. The Sheas do not dispute these facts. Moreover, Dr. Gonzalez testified in his deposition that the leave of absence was not necessary to his conclusion that K & E's sepia paper had precipitated Chester Shea's condition. *Id.* at 54. Finally, even if it were true that Dr. Gonzalez was not *positive* about the cause of Mr. Shea's condition until March, 1982, this fact would not alter the unequivocal evidence that Dr. Gonzalez believed as of October 30, 1981, that the sepia paper was at least the *likely* cause of Chester Shea's illness, and so informed Mr. Shea.

■ Similarly, Dr. Gonzalez's general letters on Chester Shea's behalf are immaterial to the question of likely notice. The first two letters, written in March of 1982 and February of 1983, stated, in effect, that the sepia paper "seemed" to be causing Chester Shea's condition. The December, 1983 letter suggests that the chemical in the sepia paper was the definite cause of Chester Shea's illness. This series of letters does not conflict with the evidence that both Dr. Gonzalez and the Sheas knew as of October, 1981, that the sepia paper was the likely cause of Mr. Shea's illness. In any case, even if these letters could be

construed as a form of equivocation by Dr. Gonzalez, such evidence has little bearing on the statute of limitations inquiry. *Fidler*, 714 F.2d at 200 ("were we to consider later [doctor's] statements capable of raising an issue of fact as to notice of causation, notwithstanding a more forceful earlier statement, the running of the limitations period would be subject to cancellation with every change in a doctor's thinking").

■ The court has also considered the Shea's contention, raised for the first time by counsel at oral argument, that Dr. Gonzalez did not inform the Sheas of his findings until January, 1982. This claim is not supported by the record. Dr. Gonzalez testified that it was his common practice to discuss the discharge summary with · his patients and was sure he did so with Chester Shea in October 1981. Gonzalez Dep. at 38. This testimony is supported by the fact that the Sheas do not dispute that Dr. Gonzalez informed Chester Shea of the results of the April, 1981 tests as soon as the doctors had finished patch testing him with K & E's sepia paper and determined that he had reacted positively to it. In addition, despite the opportunity to do so, the Sheas have submitted no evidence to support their counsel's contention that Dr. Gonzalez did not inform them of the results of the October tests at the time of Mr. Shea's discharge.[7]

In short, the Sheas' counsel's claim that Dr. Gonzalez did not discuss the results of the October, 1981 tests with Chester Shea at the time of his discharge is not supported by the evidentiary record and thus

does rise to the level of a material disputed fact. *See Hahn*, 523 F.2d at 468 (to state a disputed material fact, plaintiff must produce the requisite quantum of evidence to enable him to reach the jury with his claim); *Manganaro v. Delaval Separator Co.*, 309 F.2d 389, 391 (1st Cir.1962) ("the gossamer threads of whimsy, speculation and conjecture" do not create issues of disputed material fact). *Cf. Errichiello v. Eli Lilly and Co.*, 618 F.Supp. 484 (D.Mass.1985) (summary judgment inappropriate on statute of limitation question where plaintiff's doctor did not inform her of the likely cause of her cancer, and where plaintiff has raised disputed material facts as· to when her cause of action accrued). Instead, even viewing the record in the light most favorable to the Sheas, the court finds that there is no evidence to dispute the fact that Dr. Gonzalez asserted "a firm conviction of causation" in October of 1981. *Fidler*, 714 F.2d at 200.[8]

Based on the foregoing analysis, the court concludes that the Sheas have failed to carry their burden of showing that their claims are not barred by the Massachusetts statutes of limitations. *Franklin*, 381 Mass. at 619, 411 N.E.2d 458. The Sheas knew or should reasonably have known as early as April, 1981, and no later than October, 1981, that the sepia paper that K & E manufactured and Chester Shea used at work was a likely cause of his skin condition. As such, the Sheas had until October 30, 1984, at the latest, to perfect their claim and file this action. Having waited until January 4, 1985 to file their complaint, the Sheas' claims are barred by

---

7. At the March 20, 1986 hearing, counsel for the Sheas argued that Dr. Gonzalez's July 10, 1985 affidavit indicated that he did not inform the Sheas of the results of the October, 1981 tests until January, 1982. Transcript of Hearing on Defendant's Motion to Dismiss or for Summary Judgment (hereinafter cited as "Hearing Tr.") at 19. The court has re-read Dr. Gonzalez's affidavit, but has found no reference in that document to the date on which Dr. Gonzalez told Mr. Shea about the results of the October, 1981 tests. The court asked the Sheas' attorney if there was anything else in the record to support his argument that Dr. Gonzalez did not inform Mr. Shea of the results of the October, 1981 tests until January, 1982. Plaintiffs' counsel represented that plaintiffs, in their answers to interrogatories, stated that Dr. Gonzalez informed them by letter in January and March, 1982, respectively, that "he felt there was a correlation between the two although [he was] not posi- ·tive." Hearing Tr. at 19. The court has re-

viewed Addendum I to Plaintiff's Answers to Interrogatories, but was unable to locate any statements resembling the answer or answers referred to by plaintiffs' counsel.

8. The Sheas also dispute that Dr. Gonzalez told Mr. Shea to leave his job at the time of Mr. Shea's discharge. The Sheas contend that Dr. Gonzalez made this recommendation in January, 1982. *See* Addendum I. They do not specify a precise date in January. This apparent disputed fact is not material to the disposition of Defendant's motion. Even if Dr. Gonzalez suggested in January, 1982, that Mr. Shea leave his job, he would still have informed Mr. Shea of the *likely* cause of Mr. Shea's condition as early as April, 1981, and no later than October, 1981. Thus, the dispute over when Dr. Gonzalez told Mr. Shea to leave his job does not alter the fact that Mr. Shea was on notice of the *likely* cause of his illness no later than October, 1981.

**50**

the Massachusetts statutes of limitations for negligence and breach of warranty.

In setting a three-year statutes of limitations for negligence and breach of warranty actions, the Massachusetts General Court struck a balance between the need to provide plaintiffs with a judicial forum in which to litigate common law claims and the need to prevent the prosecution of stale claims. *See Olsen,* 388 Mass. at 175, 445 N.E.2d 609; *see also Kubrick,* 444 U.S. at 117, 100 S.Ct. at 357. The discovery rule is the result of the efforts of the Supreme Judicial Court of Massachusetts and the First Circuit Court of Appeals to interpret and apply these statutes of limitations faithfully. This court is, of course, required to implement these legislative and judicial judgments in the context of the facts of this case.[9]

K & E's motion for summary judgment is therefore ALLOWED.

---

**9.** The decision in this case is consistent with the First Circuit's holding in *Fidler.* The plaintiff in *Fidler* began suffering back and leg pain in October of 1973. She received medical treatment for her pain, including a myelogram. A myelogram is an x-ray photograph of the spinal cord after it has been injected with a contrast medium called Pantopaque. The plaintiff's pain persisted so she had a second myelogram done. In June, 1976, the plaintiff went to a hospital emergency room with crushing head and facial pains. Plaintiff underwent a series of tests from September, 1977 to September, 1978. At the end of these tests, plaintiff's doctor, Dr. Butler, told her that he had found a glob of Pantopaque in her spine left over from her myelograms and thought that the Pantopaque was causing her pain. In 1979, the plaintiff consulted an attorney and took other steps to investigate her claim. In 1980, Dr. Butler later stated that he was not sure of the cause of the plaintiff's condition. On September 23, 1981, after consulting another doctor who told her that the Pantopaque might be causing her pain, the plaintiff filed her suit.

Based on these facts, the Court of Appeals held that the plaintiff was on likely notice of the cause of her condition as of September 7, 1978, the day that Dr. Butler told her that he thought that a residium of Pantopaque was causing her pain. Thus, the three-year statutes of limitations barred the plaintiff's claims for negligence and breach of warranty against the manufacturer of the Pantopaque.

The facts of the instant action provide a more compelling case for enforcing the statutes of limitations than the facts in *Fidler.* First, the Sheas concede that as of March, 1982, they were convinced that the sepia paper had been causing Mr. Shea's condition. Thus, they perfected their claim within four months of the date on which they had notice of the likely cause of Mr. Shea's illness. In *Fidler,* the plaintiff maintained that she did not know the cause of her condition until *after* she filed her lawsuit. Second, in *Fidler,* the plaintiff missed the deadline for filing her claim by two weeks. Here, the Sheas missed the deadline by at least two months, and possibly by as much as seven months. Third, in *Fidler,* the plaintiff's doctors equivocated in their opinions as to the cause of her pain. In addition, the plaintiff underwent numerous further tests after the date on which she had notice of the likely cause of her symptoms. Here, Dr. Gonzalez never equivocated on the likely cause of Mr. Shea's illness. Nor did Mr. Shea undergo further scientific tests after October 30, 1981, although he did stop working to definitively establish to his own satisfaction the cause of his condition.

Based on these facts, court finds as *Fidler* was an appropriate case for finding the plaintiff's claims barred by the statutes of limitations, this also must be deemed to be such a case.