67 F.3d 307
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Genevieve MILLING, Plaintiff-Appellant,
v.
LAS VEGAS METROPOLITAN POLICE DEPARTMENT; Tim Opdendyk,
Officer, et al., Defendants-Appellees.
 No. 94-16121.
 United States Court of Appeals, Ninth Circuit.
 Submitted Sept. 11, 1995.*
Decided Sept. 20, 1995.
 
 1
 Before: BEEZER and THOMPSON, Circuit Judges, and QUACKENBUSH, District Judge.**
 
 
 2
 MEMORANDUM***
 
 OVERVIEW
 
 3
 After her son, Jesse Thomas Miles, was shot and killed during an altercation with Las Vegas Police officers, Genevieve Milling brought this civil action against the Las Vegas Metropolitan Police Department (LVMPD), and individual Las Vegas Police Officers Tim Opdendyk, Gregory King, and Eric Fricker (collectively, "defendants"). Her complaint stated both federal and state law claims. The federal claim, brought under 28 U.S.C. Sec. 1983, alleged Milling's Fourteenth Amendment rights[1] were violated because Officers Opdendyk and King unjustifiably killed her son and then conspired with Officer Fricker to cover up the facts of his death.[2] It further alleged the officers acted pursuant to a "plan, scheme, custom, usage and policy of LVMPD to violate federal constitutional rights." The state law claims were for wrongful death, negligence and intentional infliction of emotional distress.
 
 
 4
 The district court granted summary judgment in favor of the defendants on all of the claims alleged in the complaint. Milling appeals the district court's order.
 
 
 5
 We have jurisdiction under 28 U.S.C. Sec. 1291, and we affirm.
 
 FACTS
 
 6
 On January 3, 1991, Officers Opdendyk and King were dispatched to a Kentucky Fried Chicken restaurant located at 2840 E. Tropicana. They were informed that an adult black male in the establishment was refusing to pay for food and was eating food off the plates of other patrons.
 
 
 7
 Upon their arrival, the officers spoke with Kimberly Engerbritson, the restaurant manager. Engerbritson stated that the subject, who was later identified as Milling's son, Jesse, was in the back of the restaurant and was wearing a blue windbreaker. She also told the officers she was concerned he might have a weapon.
 
 
 8
 The officers found Jesse seated in the far rear booth of the restaurant. As they began to approach him, Jesse stood up and attempted to pass them. The officers asked Jesse where he was going, but he did not answer. They also asked for identification but received no response. Eyewitnesses to the incident--employees and patrons of the restaurant--testified that the officers were "nice" and "very polite." On the other hand, they described Jesse's behavior and demeanor as "crazy," "weird," or simply not normal. One patron said Jesse looked like he wanted to fight.[3]
 
 
 9
 The officers observed that, from the moment Jesse had stood up, he kept his hands in his jacket pockets. Officer Opdendyk asked Jesse if he was carrying a weapon, to which Jesse responded "What about weapons? You guys carry weapons." Officer Opdendyk then asked Jesse several times to remove his hands from his pockets "for officer safety," but his requests were ignored.
 
 
 10
 Concerned about Jesse's odd behavior and the possibility that he might be carrying a weapon, the officers attempted to pull Jesse's hands out of his pockets. Although Jesse resisted, the officers ultimately succeeded in doing so.
 
 
 11
 What happened next is, essentially, the crux of the dispute in this case. The officers claim that when Jesse's left hand finally came out of his pocket, they observed he was holding a gun and that his finger was on the trigger. Employees and patrons of the establishment who were eyewitnesses to the incident confirmed this fact. A struggle ensued, during which Jesse pointed the gun at Officer King. Fearing Jesse would shoot King, Officer Opdendyk drew his weapon and demanded that Jesse drop the gun or he would have to shoot. When Jesse refused, Officer Opdendyk shot him.
 
 
 12
 Milling did not argue before the district court, nor does she here, that given the facts as stated above the officers acted improperly. Such a claim would have been untenable. It is clear that police officers are entitled to use deadly force to protect themselves and others from the threat of physical harm. See, e.g., Ting v. United States, 927 F.2d 1504, 1510 (9th Cir.1991).
 
 
 13
 Milling contends, however, that Jesse did not in fact have a gun in his possession, and the officers' use of deadly force was therefore unreasonable. She contends the .38 caliber Smith & Wesson revolver that was retrieved from the scene--from a table in the restaurant where Officer King claims to have placed it after removing it from Jesse's hand--was a "throw-down weapon" planted by the officers to cover up the fact that they unjustifiably shot an unarmed man. She contends the officers perpetuated this cover-up by committing perjury at the subsequent coroner's inquest and tampering with evidence to make it appear as though the gun belonged to Jesse.
 
 STANDARD OF REVIEW
 
 14
 We review a district court's grant of summary judgment de novo. Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986) (quoting Fed.R.Civ.P. 56(c)).
 
 
 15
 An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 248-49. In deciding whether there is a genuine issue for trial, the court should not weigh the evidence or assess credibility; it should view the evidence in the light most favorable to the nonmoving party. Id. at 249; Jesinger, 24 F.3d at 1130. However, if the evidence is "merely colorable" or "not significantly probative," summary judgment should be granted. Id. at 249-50. Although the nonmoving party "is entitled to all favorable inferences, he is not entitled to build a case on the gossamer threads of whimsey, speculation, and conjecture." Hahn v. Sargent, 523 F.2d 461, 467 (9th Cir.1975) (quoting Manganaro v. Delaval Separator Co., 309 F.2d 389, 393 (1st Cir.1962)), cert. denied, 425 U.S. 904 (1976).
 
 DISCUSSION
 
 16
 In this case, there is no "genuine" issue with respect to whether Jesse had a gun. The evidence in the record--even when viewed in the light most favorable to Milling--leads to the inexorable conclusion that he did.
 
 
 17
 Four eyewitnesses, aside from Officers Opdendyk and King, testified that they saw Jesse holding a gun. Kimberly Engerbritson testified that the officers "pulled [Jesse's] hand out of his pocket and he had a gun." So did Robert Hamaker. Shirlee Schroeder stated she saw the gun in Jesse's hand and noticed he had a tight grip on it. Francis Horst said she was "absolutely" sure Jesse had a gun.[4]
 
 
 18
 Milling argues the testimony of three other eyewitnesses--Patricia Scott, Charlene Sharon Norsten, and Eugene Rolfes--refutes the statements made by Engerbritson, Hamaker, Schroeder, and Horst, and creates a triable issue as to whether Jesse had a gun. We disagree. Both Scott and Rolfes testified they did not see Jesse with a gun, but they also stated they were positioned such that Jesse's hands were not visible to them at all. Norsten also testified she did not see a gun in Jesse's hands, but from her vantage point she also could not see whether the officers had their weapons drawn. Thus, none of these witnesses testified that Jesse did not have a gun, they simply stated that they weren't able to see one.[5] Significantly, each of these witnesses, despite the fact that they couldn't actually see whether Jesse had a gun, was of the impression that the officers had acted properly.
 
 
 19
 Milling attempted to shore up her argument that the gun found at the scene could not have been Jesse's by presenting evidence that Jesse was a "nonviolent" person who was afraid of guns. She also argued Jesse did not have a gun when she last saw him the day before, and could not have obtained a gun in the interim. She contended that the gun found at the seen was "obviously" a throw-down weapon because there were no fingerprints on it, and it was carried in a "professional" manner, with no cartridge in front of the hammer.
 
 
 20
 All this evidence is meaningless in light of the unambiguous eyewitness testimony establishing that Jesse did have a gun. Nonetheless, we examine it below.
 
 
 21
 First, Milling's assertion that there were no fingerprints on the gun is incorrect. The evidence revealed only that no identifiable prints were discovered. The absence of identifiable prints in no way supports Milling's contention that the officers had wiped the gun clean.
 
 
 22
 Milling's argument regarding the manner in which the gun was carried is equally flawed. The evidence in the record indicated that LVMPD officers generally carry weapons with the magazine full and the bullet chambered. There is also no reason why a private individual would not leave the hammer resting on an empty chamber to prevent accidental discharge. Thus, the condition of the gun is not indicative of anything.
 
 
 23
 With respect to Milling's evidence of Jesse's "nonviolent" nature, this evidence consisted of her own testimony that Jesse was afraid of guns, as well as the testimony of Won T. Lee, Jesse's psychiatrist. Lee testified he never observed any violence on Jesse's part, and that being afraid of guns would be "consistent" with Jesse's personality. However, he also testified he never saw Jesse outside the office setting, and would not know whether Jesse exhibited violent tendencies in other contexts. He was "surprised" to learn that Jesse had been convicted of assault.[6] He acknowledged that his opinions regarding how Jesse would react around guns were mere speculation. He admitted Jesse displayed paranoid tendencies as a result of his schizophrenia, especially when he was not taking his medication, and said he could not predict how Jesse might act on those paranoias. Finally, Lee testified he had not seen Jesse in several years.
 
 
 24
 Milling's "evidence" that Jesse could not have obtained a gun consisted of her assertion that he only had $5 with him when she last saw him, and therefore could not have purchased one. This evidence," even if true, does not account for the various other ways by which Jesse may have obtained possession of a gun--including theft.[7]
 
 CONCLUSION
 
 25
 The district court properly granted summary judgment in favor of the defendants. There was insufficient evidence to raise a genuine dispute as to whether Jesse had a gun. Because the evidence established that Jesse had a gun and threatened the officers with it, the officers' response was lawful. There was nothing for the officers to "cover up" because they committed no constitutional violation. Nor are they liable on Milling's state tort claims because these claims all depend upon a showing of wrongful conduct and, given that Jesse threatened them with a gun, the officers' conduct was not wrongful.[8]
 
 
 26
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for disposition without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 **
 Hon. Justin L. Quackenbush, Senior District Judge for the Eastern District of Washington, sitting by designation
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The complaint specifically alleged an equal protection violation, but the substance of the claim appeared to be, based on all the assertions in the complaint, that Milling's due process rights had been violated. See also Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir.1991) (parents of victim of excessive force can bring Fourteenth Amendment due process claim for loss of child's society and companionship), cert. denied, 113 S.Ct. 460 (1992). Indeed, Milling moved for leave to amend the complaint to specifically allege a due process claim based on loss of her son's companionship, but the district court never ruled on her motion. For purposes of this disposition, we assume Milling alleged a proper due process claim. From its order, it appears the district court did the same. The allegations in the complaint simply do not support a claim that Milling's equal protection rights were violated
 
 
 [2]
 The complaint also alleged a violation of Jesse's own due process rights. The district court construed this claim as though it alleged a violation of Jesse's Fourth Amendment right to be free of unreasonable seizures, presumably because, after Graham v. Connor, 490 U.S. 386 (1989), excessive force claims brought by or on behalf of the victim of the alleged misconduct can only be pursued under the Fourth Amendment. See Ward v. City of San Jose, 967 F.2d 280, 284 (9th Cir.1991); Curnow, 952 F.2d at 325; Eberle v. City of Anaheim, 901 F.2d 814, 820 (9th Cir.1990). The court then granted summary judgment as to this claim on the ground that Milling, who was suing in her individual capacity and not as executrix of Jesse's estate, lacked standing. Milling does not appeal this portion of the district court's order
 
 
 [3]
 These descriptions of Jesse are consistent with the fact that he suffered from undifferentiated schizophrenia which, according to Milling, caused him to act strangely, at least when he was not taking his medication, which he had not taken that day
 
 
 [4]
 Another eyewitness, Charles Sudbury, testified he saw "something shiny" in Jesse's hand
 
 
 [5]
 In contrast, Engerbritson claimed to have had an "unobstructed" view of Jesse. Horst said she was "very close" to Jesse when she saw the gun, and Schroeder said she was so close to Jesse and the police officers when the gun was pulled from Jesse's pocket that she "could have touched them."
 
 
 [6]
 Jesse's "rap sheet" revealed he had numerous misdemeanor and felony arrests for drug use, burglary, theft, robbery and assault. On one occasion, he had been confined in prison. An autopsy of Jesse's body revealed traces of alcohol, PCP, and cocaine in his bloodstream
 
 
 [7]
 We note that a nylon wallet containing various forms of identification, which clearly did not belong to Jesse, was discovered on his body
 
 
 [8]
 We do not address Milling's claim that LVMPD has a policy of "violating federal constitutional rights" because she has suffered no constitutional violation as a result of this alleged policy and, therefore, cannot assert this claim. See Chew v. Gates, 27 F.3d 1432, 1439 (9th Cir.1994), cert. denied, 115 S.Ct. 1097 (1995). We deny the defendants' request for an award of attorney fees under 42 U.S.C. Sec. 1988. Vernon v. City of Los Angeles, 27 F.3d 1385, 1402 (9th Cir.1994), cert. denied, 115 S.Ct. 510 (1994)