·Albert R. PITTS, individually and as father and next friend of Michael Pitts, a minor, and Dorothy Pitts, Plaintiffs,

v.

AEROLITE SPE CORPORATION, Defendant.

George CORNELL and Isabelle Cornell, Plaintiffs,

· v.

E.I. DuPONT DeNEMOURS AND CO., Glendale Optical Co., Inc., and Mobay Chemical Corporation, Defendants.

Carol A. ROBERTS, individually and as mother of Jennifer L. Roberts, Plaintiffs,

v.

THOMPSON MEDICAL COMPANY, INC., Defendant.

Civ. A. Nos. 83–2890–Y, 84–1595–Y and 85–0132–Y.

United States District Court, D. Massachusetts.

June 2, 1987.

Norman A. Hubley, William A. Scofield, Jr., Boston, Mass., for CIBA–GEIGY Limited.

John Arata, James Hamilton, Perkins, Mecsas, Smith, Arata & Howard, Boston, Mass., for Areolite Spe Corp.

Edmund M. Pitts, Pitts & Pitts, Boston, Mass., for Pitts.

Frederic N. Halstorm, Halstrom & Hughe, Boston, Mass., for Roberts.

James F. Meehan, Warren F. Fitzgerald, Meehan, Boyle & Cohen, Boston, Mass., for Thompson Medical.

Albert P. Zabin, Schneider, Reilly, Zabin, Connolly & Costello, Boston, Mass., for George Cornell.

Rocco DiFazio, Waymouth, Mass., for Isabelle Cornell.

John C. Wyman, Roche, Carens & DeGiacono, Boston, Mass., for defendant, Du Pont.

Robert A. Curley, Jr., Curley & Curley, Boston, Mass., for defendant Glendale.

Peter L. Puciloski, Sugarman, Rogers, Barshak & Cohen, Boston, Mass., for defendant, Minnesota Mining.

Parker, Coulter, Daley & White, Boston, Mass., Sarah Harnish, Mary M. Sullivan, for Mobay Chemical Corp.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

These cases are before the Court on the motions for summary judgment filed by all the defendants [1] who argue that the plaintiffs' claims are barred by the relevant statutes of limitations. In each case the plaintiffs have brought a products liability action for negligence and breach of warranty seeking recovery for personal injuries, loss of consortium, and, in one case, property damage. In Case No. 83–2890–Y (hereinafter the "Pitts Case"), Albert R. Pitts, his wife Dorothy, and their son Michael [2] allege that they have been injured due to their exposure to Urea Formaldehyde Foam Insulation ("Insulation"). In Case No. 84–1595–Y (hereinafter the "Cornell Case"), George and Isabelle Cornell allege injury due to George Cornell's exposure to Imron Polyurethane paint containing 192–S Activator ("Imron"). Finally, in case No. 85–0132–Y (hereinafter the "Roberts Case"), Carol and Jennifer Roberts allege that they were injured as a result of her ingestion of Dexatrim, a weight loss tablet. Jurisdiction exists in all three cases

---

1. In Case No. 85–0132–Y, the parties have filed cross motions for summary judgment.

2. The Court notes that the defendant Aerolite SPE Corporation does not press its motion for summary judgment against Michael Pitts, a minor, in case No. 83–2890–Y.

on the basis of diversity of citizenship, 28 U.S.C. § 1332 (1982).

Because the legal principles implicated by all three motions are common, the Court finds it expedient to issue this joint memorandum and order.

## I.

THE FACTS

Viewing the record now before the Court in the light most favorable to the party opposing the motion, and indulging all inferences favorable to that party, *Ismert and Associates, Inc. v. New England Mutual Life Insurance Co.*, 801 F.2d 536, 537 (1st Cir.1986) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 [1st Cir.1975], *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 [1976], the following facts reasonably could be found in each case.

### A. *The Pitts Case*

In September, 1977, Albert and Dorothy Pitts had insulation installed in the walls, ceilings, and floor spaces of their home. Aerolite SPE Corporation ("Aerolite") is an American distributor of the foam insulation product used by the Pitts and manufactured by Ciba–Geigy (U.K.) Ltd.[3] At the time of the installation, and for some years afterwards, Dorothy Pitts[4] complained of a distinct odor emanating from the insulation. Odor was the least of her worries. Both Albert and her son Michael soon began to experience headaches, sinus congestion, and different forms of ear, eye, nose, and throat irritation immediately after the installation.

Prior to the winter of 1977, Albert Pitts did not suffer from any respiratory or sensory disorders. In December, 1978 or January, 1979, Albert Pitts visited a physician for treatment of his congestion. He was prescribed a decongestant. His condition continued although the congestion improved when he inhaled the steam from his early morning hot showers. It also improved substantially when he spent any appreciable time away from his home, for example on his vacations.

Prior to September, 1977, Michael Pitts did not experience any allergic symptoms aside from the average cold. During the winter after the installation of the insulation, Michael Pitts began suffering from nasal congestion, earaches, and headaches. In August, 1978, Dorothy Pitts took her son to a physician for an examination. He was treated with an allergy spray for his condition. In September, 1979, Dorothy Pitts brought Michael in for another examination because his symptoms continued. At that time Dorothy Pitts asked the physician if her son's condition could be caused by the installation of the insulation. Prior to her discussion with the physician, Ms. Pitts had been asked by various friends whether the sudden illnesses of her family might not be due to the insulation. According to Ms. Pitts, the physician did not give any answer to her question. The record is inconsistent as to the extent of Albert Pitts' knowledge of this discussion between his wife and the physician.

At some time, Albert and Dorothy Pitts became aware through the media that there were government investigations of urea formaldehyde foam insulation. Albert Pitts stated that he cannot remember when he first read or heard of the reports. He does remember viewing a television news program on ABC News 20/20 on February 4, 1982 in which the reports were discussed. The Pitts allege that they made no causal connection between their injuries and the installation of the insulation until they viewed the news program, believing that their symptoms were due to a series of bad colds or an allergic reaction to shrubbery, feather pillows, or some other house-

3. Various other manufacturerees and distributors have already been dismissed from this action. *See Pitts v. Ciba–Geigy Corp.*, 616 F.Supp. 1495 (D.Mass.1985).

4. Albert Pitts noticed the odor for approximately the first thirty days, but then he apparently became used to it. He stated that his wife never stopped complaining of the odor. There is some inconsistency as to whether Dorothy Pitts believed that the continuing odor was caused solely by the insulation, by gas leaks, or some combination of the two.

hold item. They commenced this action on September 26, 1983.

### B. *The Cornell Case*

George Cornell was employed as a spray painter by the Massachusetts Bay Transportation Authority during the years 1980–82. During this period he spray painted "Red Line" train cars with Imron Polyurethane paint manufactured and sold by the defendant E.I. DuPont de Nemours & Co., Inc. ("DuPont"). Imron contains a mixture of DuPont's Imron Polyurethane enamel and DuPont's Imron Activator 192–S. During the period of Cornell's use of the paint, DuPont incorporated Desmodur N–75 into the Imron, a product manufactured by the defendant Mobay Chemical Corporation. While applying the paint, Cornell wore a cartridge respirator manufactured by the defendant Glendale Optical Company, Inc. Imron allegedly caused George Cornell's respiratory ailments and gave rise to Isabelle Cornell's loss of consortium claim.

Mr. Cornell began spray painting with Imron in January or February of 1980. Within several months of regular spray painting, he began to experience what he characterizes as flu-like symptoms. His symptoms included spitting up of paint, coughing, chest pains, dizziness, and difficulty in breathing. Isabelle Cornell witnessed her husband's nightly difficulties. As the months progressed, Mr. Cornell's condition became more acute. By December, 1980, Mr. Cornell associated his respiratory problems with the spraying of polyurethane paint. Finally, on June 11, 1981, Mr. Cornell visited a physician for treatment. He disclosed to his physician that he thought his symptoms were attributable to his spray painting and also stated that he smoked approximately two packs of cigarettes per day. On July 28, 1981, Mr. Cornell was diagnosed as having chronic obstructive lung disease. The present action was filed on February 29, 1984.

### C. *The Roberts Case*

On June 16, 1981, Carol Roberts suffered a stroke and was taken for treatment to the University of Massachusetts Medical Center. The diagnostic physician, Dr. Lisse, asked her whether she was then taking any medication. She responded that she had been taking Dexatrim, a weight loss pill manufactured and marketed by the defendant Thompson Medical Co., and birth control pills. Ms. Roberts asked Dr. Lisse whether the Dexatrim could be a cause of her illness. He rejected the idea immediately, although he did advise her to discontinue using the product and to eat a more nutritional diet in the future. Dr. Lisse diagnosed Ms. Roberts' condition as due to tension anxiety headaches. In reliance upon this diagnosis and the doctor's previous answer to her query about Dexatrim, Ms. Roberts did not pursue any further the idea that Dexatrim may have caused her injury.

In either May or June, 1983, Ms. Roberts read an article in the May 1983 issue of FIT magazine which discussed the adverse side effects of Dexatrim. After reading the article, Roberts contacted the Center for Science in the Public Interest in Washington, D.C. and received information on the relationship between Dexatrim and cerebral injuries. Roberts contacted Dr. James McCarthy in May or June, 1984, and brought the FIT magazine article to his attention. Dr. McCarthy conducted further research on the causal connection and recommended that she contact an attorney. In September, 1984, Roberts retained counsel and on January 9, 1985, filed this complaint.

## II.

### DISCUSSION

### A. *Summary Judgment on Statute of Limitations Defense*

"Summary Judgment is appropriate only if 'there is no genuine issue as to any material fact,' Fed.R.Civ.P. 56(c), and the court must look at the record in the light most favorable to the party opposing the motion, indulging all inferences in that party's favor." *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 197–98 (1st Cir.1983) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 [1st Cir.1975]). In addition, however, "the plain language of Rule 56(c) mandates the

entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, ——, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986); *Potterton v. Porter,* 810 F.2d 333, 334 (1st Cir. 1987). Under the standard for statutes of limitations defenses in the products liability context presented, the plaintiffs have the burden of proving facts to show that their claims are not barred by the impact of the statutes of limitations. *Franklin v. Albert,* 381 Mass. 611, 619, 411 N.E.2d 458 (1980); *Errichiello v. Eli Lilly and Co.,* 618 F.Supp. 484, 486 (D.Mass.1985).

### B. *Statutes of Limitations in Products Liability Actions*

State statutes of limitations apply to claims brought in federal court on the basis of diversity jurisdiction. *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Buckley v. American Honda Motor Company, Inc.,* 780 F.2d 1 (1st Cir.1985). Under Massachusetts state law, both negligence claims, Mass.Gen. Laws ch. 260, § 2A (1984),[5] and breach of warranty claims, Mass.Gen.Laws ch. 106, § 2–318 (1984),[6] are governed by a three-year statute of limitations. Massachusetts courts apply the "discovery rule" to determine when a plaintiffs' products liability claim for an insidious disease accrues. *Olsen v. Bell Telephone Laboratories, Inc.,* 388 Mass. 171, 445 N.E.2d 609 (1983). The determination of the application of the discovery rule is a question for the court. *Id.* at 175, 445 N.E.2d 609. The same standard is applied for both negligence and breach of warranty claims. *Fidler v. Eastman Kodak Co.,* 714 F.2d 192 (1st Cir.1983); *see also Fidler v. E.M. Parker Co.,* 394 Mass.

534, 476 N.E.2d 595 (1985) (approving of First Circuit court's identical application of "discovery rule" to negligence and breach of implied warranty claims).

Under the discovery rule, a cause of action does not accrue until the plaintiffs know or reasonably should have known that they were injured as a result of the defendant's conduct. *Olsen,* 388 Mass. at 175, 445 N.E.2d 609; *Whitcomb v. Pension Development Co., Inc.,* 808 F.2d 167, 169 (1st Cir. Dec. 31, 1986). The courts have been "guided by the principle that a plaintiff be put on notice before his or her claim is barred by the passage of time." *Id.; Franklin,* 381 Mass. at 619, 411 N.E.2d 458. Thus, plaintiffs "reasonably should have known" both they had suffered injury and that the defendant's conduct caused that injury before the limitations period begins to run. The plaintiffs need not know that their injuries are legally compensable, *Fidler v. Eastman Kodak Co.,* 714 F.2d at 199, but rather they must be put on notice such that they have a "duty to discover from the legal, scientific, and medical communities whether the theory of causation is supportable and whether it supports a legal claim." *Id.*

Finally, the level of notice required to start the statute running has been defined as "likely cause." *Id.; see Fidler v. E.M. Parker Co.,* 394 Mass. at 546, 476 N.E.2d 595 (approving of "likely cause" language). Thus, once on notice of facts sufficient that they reasonably should have known that their injuries were likely caused by the defendant's conduct, the plaintiffs have three years to ascertain whether their claims are legally supportable.

### C. *Application of Discovery Rule*

#### 1. The Pitts Case

 The Pitts' claims are barred by the statutes of limitations if they knew or

---

**5.** Mass.Gen.Laws ch. 260, § 2A (1984) provides: "Except as otherwise provided, actions of tort, actions of contract to recover for personal injuries, and actions of replevin, shall be commenced only within three years next after the cause of action accrues."

**6.** Mass.Gen.Laws ch. 106, § 2–318 (1984) provides in relevant part: "Lack of privity between

plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty.... All actions under this section shall be commenced within three years next after the date the injury and damage occurs."

reasonably should have known on or before September 21, 1980 that the insulation was the likely cause of their disorders. The Pitts were certainly on notice of their injuries shortly after September, 1977. While their knowledge of the likely causal connection between their injuries and the defendant's conduct is a more difficult issue, the facts show that the Pitts were on notice of the likely causal connection as of September 1979, if not earlier, when Dorothy Pitts sought medical advice from a physician on her son's condition. At that time, the Pitts had sufficient justification for their belief that the insulation was probably the cause of their injuries.[7] The Pitts were aware of a "nasty" odor in their home from the date of the installation. They noted a precipitous and unexplained increase in congestive problems, eye and ear irritation, and headaches; injuries that were inconsistent with their prior health histories. Albert Pitts also noticed that his condition improved when he spent time away from his home. During this period, friends alerted Dorothy Pitts that her family's condition might be due to the insulation.[8] Armed with this information, Dorothy Pitts approached a physician with her belief that the insulation might have caused her family's illnesses. She says she was not given an answer. She chose not to explore the matter any further.

Statutes of limitations are designed to provide plaintiffs a reasonable time to present their claims, after which time, "it is unjust to fail to put the adversary on notice to defend.... [Statutes of Limitations] protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence...." *United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 356–357, 62 L.Ed.2d 259 (1979). Thus, once on notice, claimants cannot rest on their rights during the reasonable period of time afforded by the Massachusetts legislature within which to commence an action. The Pitts, once on notice, ignored their duty to further investigate the relation between their insulation and their injuries. As a result of this failure, their claims are barred.

### 2. The Cornell Case

The Cornells' claims are barred by the statutes of limitations if they knew or reasonably should have known on or before February 29, 1981 that their injuries were likely caused by George Cornell's use and exposure to the Imron paint. The facts in this case show that at least as early as December, 1980 the Cornells had sufficient justification for their belief that the Imron paint probably caused their injuries.[9] They were on notice throughout 1980 each night when George Cornell used the spray paint and experienced the side effects, most notably the spitting up of paint and regular dizziness. George Cornell was justified on the basis of his experience [10] with the spray

---

7. The Court interprets the requirement of knowledge of likely cause as requiring first, a belief that the defendant's conduct likely or probably, *see Webster's New Collegiate Dictionary* 660 (1980), caused the injury, and second, some justification for that belief. The Court believes this to be a helpful and appropriate explication of the standard enunciated by the First Circuit in *Fidler v. Eastman Kodak Co.* and the Massachusetts Supreme Judicial Court in *Olsen. See generally* D. Hume, *An Enquiry Concerning Human Understanding* §§ VI–VII (1748), *reprinted in The Empiricists* 307, 348 ("As a great number of views do here concur in one event, they fortify and confirm it to the imagination, beget that sentiment which we call *belief,* and give its object the preference above the contrary event, which is not supported by an equal number of experiments, and recurs not so frequently to the thought in transferring the past to the future.") (emphasis in original).

8. In November, 1979, the Massachusetts Department of Public Health, as a result of testimony gathered at public hearings, issued regulations banning Urea Foam Formelhyde Insulation in Massachusetts. The testimony focused on the adverse health effects experienced by consumers of the product. Plaintiffs' Amended Complaint, ¶¶ 15–16. The regulations have been contested. At some point in time, the Pitts became aware, either through the media, friends, or both, of these reports. Albert Pitts cannot recall when he first became aware of the reports.

9. *See supra* note 3. The Court does not express any opinion as to whether the Imron did in fact cause or aggravate the injuries alleged.

10. Plaintiffs' assertion that they were not on notice with a corresponding duty to investigate until the July 28, 1981 diagnosis rests upon a misstatement of the standard to be applied to

paint to believe by December of 1980, as he has so stated, that the paint was causing his condition. At that time he had a duty to investigate his condition by resort to consultation from the medical field. He chose not to do so until June 11, 1981. By postponing his duty to investigate, he leaves this Court no choice but to rule that his action is time barred.

### 3. The Roberts Case

■ The statutes of limitations will bar the Roberts' claims if they knew or reasonably should have known by January 9, 1982 that Dexatrim likely caused their injuries. On the facts thus far presented this Court cannot conclude that the Roberts knew or reasonably should have known of the likely causal connection between her injuries and the defendant's conduct by that date. Ms. Roberts never maintained, nor could she reasonably have done so, a belief that Dexatrim was the likely cause of her stroke. She never made any connection between the two even when asked during the pre-

liminary stages of her treatment what medication she had taken. True, she pursued this area with one follow up question which logically flowed from the discussion, but she never received any justification for sustaining a belief that the Thompson product probably caused her injury. In fact, Dr. Lisse's remarks eliminated any room for forming such a justification.[11] It was not until she read the article in FIT magazine that she formed a belief of the causal connection which was based upon a reasonable justification. She then filed a timely complaint. Accordingly, Thompson's motion for summary judgment is denied and Roberts' motion for summary judgment on the affirmative defense of the statutes of limitations is granted.

### III.

In accordance with the foregoing discussion it is ORDERED:

1. In the Pitts Case, Aerolite's motion for partial summary judgment is GRANTED.

---

insidious disease claims under the discovery rule. The standard, as stated above, is *not* that the plaintiff is on notice when he or she has knowledge or reason to know that he or she has a "legally compensable claim," but rather *is* that a plaintiff is on notice when he or she has sufficient facts such that he or she knows or reasonably should have known that defendant's conduct was the likely cause of his or her injury. The Cornells' articulation of the standard was rejected by the Massachusetts Supreme Judicial Court in *Olsen,* 388 Mass. at 174, 445 N.E.2d 609.

**11.** Thompson argues that Ms. Roberts made the causal connection when she followed her physician's questions with her own inquiry as to the possible causal connection between the Dexatrim and her condition.

Thompson further argues that, when Roberts was told that there was no relation between her condition and the ingestion of Dexatrim, her position was similar to that of a plaintiff discussed by the First Circuit Court in dicta in *Fidler v. Eastman Kodak Co.,* 714 F.2d at 200, i.e., she received poor medical advice and now should have to pay the cost.

The Court cannot accept this characterization of the facts. Her injury is of the "inherently unknowable" variety. Prior to her discussion with the physician she had no justification for maintaining a belief that Dexatrim was the likely cause of her injury. The facts are not akin to *Buckley v. American Honda Motor Corp.,* 780

F.2d 1 (1st Cir.1985), the authority relied upon by Thompson. In *Buckley,* the plaintiff sustained direct injuries in an auto accident. Her injuries occurred upon impact with the wheel. 780 F.2d at 1. The plaintiff's claim was barred after she failed to bring suit for defective design of the steering wheel within the statutory period. *Id.* at 3. In *Buckley,* the plaintiff did not require any expert advice as to the cause of her injury. Here, however, the plaintiff was the victim of a stroke, an illness that could be produced by a myriad of causes. The diagnosing physician told her it was due to tension anxiety headaches. She never had a belief that the defendant's conduct probably caused her injury until at least June, 1983.

Thompson's reliance upon dicta in *Fidler* is inapposite. This Court does not believe that the court in *Fidler* intended such an anomolous result. In *Fidler,* the plaintiff was given sufficient notice by a physician of the probability that her injury was caused by the defendant's conduct. 714 F.2d at 198. She was not the victim of bad medical advice. This Court interprets the language in *Fidler* to mean at most that if a plaintiff has sufficient justification for maintaining a belief that the defendant's conduct was probably the cause of her illness, and she receives poor advice upon investigation, then the duty to investigate does not necessarily end. That is, the duty continues once the plaintiff ascertains or reasonably should have ascertained the requisite knowledge to undertake the duty to investigate.

2. In the Cornell Case, the motions for summary judgment filed by E.I. DuPont DeMours and Co., Glendale Optical Co., Inc., and Mobay Chemical Corporation are GRANTED.

3. In the Roberts Case, Thompson Medical Co., Inc.'s motion for summary judgment is DENIED and Roberts' motion for partial summary judgment on the affirmative defense of the statutes of limitations is GRANTED.