Martha KAY, Plaintiff,

v.

JOHNSON & JOHNSON, et
al., Defendants.

Civ. A. No. 85–3863–WF.

United States District Court,
D. Massachusetts.

Aug. 30, 1989.

Andrew C. Schultz, Field & Schultz, Boston, Mass., for plaintiff.

Edward P. Leibensperger, Joseph G. Blute, Nutter, McClennen & Fish, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Plaintiff Martha Kay has brought this products liability action for negligence and breach of warranty against defendants Johnson & Johnson and Ortho Pharmaceutical Corporation ("Ortho"). Plaintiff claims that she suffers from a severe pigmentary disorder as a result of using Ortho Novum, an oral contraceptive manufactured by Johnson & Johnson and distributed by Ortho. The action was commenced in Massachusetts Superior Court for Bristol County on October 17, 1984. Defendants were served with the summons and complaint on September 30, 1985 and the action was removed to this court on October 11, 1985. Jurisdiction rests on diversity of citizenship. 28 U.S.C. § 1332.

Defendants have moved for summary judgment under Fed.R.Civ.P. 56, claiming that plaintiff's claims are barred by the applicable three year statutes of limitations because they were not brought until October 17, 1984.[1] *See* Mass.Gen.Laws c. 260 § 2A (three-year statute of limitations for negligence) and c. 106, § 2–318 (three-year statute of limitations for breach of warranty). Plaintiff opposes the motion for sum-

1. Defendants do not contend that plaintiff's delay in effecting service has prejudiced them or affects the date on which the action is deemed to have commenced for statute of limitations purposes. Accordingly, the court has assumed that October 17, 1981 is the date by which plaintiff must have had notice of her claims if they are to be barred by the statutes of limitations.

mary judgment. The parties have filed memoranda, affidavits, depositions, and other materials. A hearing has been held and the parties have since supplemented their memoranda.

Based on the relevant facts, which the evidence presented does not put in genuine dispute, the court concludes that plaintiff's claims are barred by the Massachusetts statutes of limitations. Defendants' motion for summary judgment is, therefore, allowed.

## I. FACTS

Unless otherwise indicated, the following facts are not genuinely in dispute. Kay is a registered nurse who received her nursing degree in 1953. From 1953 to 1978, she was employed as a nurse or nurse supervisor at the Truesdale Hospital in Fall River, Massachusetts. Deposition of Martha Kay, Tab D at pp. 7–13.[2] On March 15, 1966, Kay visited her gynecologist, Dr. Alex Friedman, to request that he prescribe an oral contraceptive. *Id.* at 42–43. Dr. Friedman prescribed Ortho Novum. Friedman Depo., Tab G at 31–32. Kay was taking no other medication at this time. Kay Depo., Tab D at 56.

Within a few months after she began taking Ortho Novum, Kay noticed a darkening of the skin on the right side of her neck. Kay Depo., Tab D at 49. The darkening subsequently spread to her knuckles, ears, legs and arms. Kay Depo., Tab D at 51. Plaintiff was aware of the progression of this condition "as it was occurring." Plaintiff's Answer # 25 to Defendant Ortho Pharmaceutical Corporation's First Set of Interrogatories, Tab C at 23.

Sometime between March 1966 and May 1967, plaintiff brought her condition to the attention of Dr. David Greer, an internist with a subspecialty in endocrinology. Kay Depo., Tab D at 52–55, 58; Greer Depo., Tab I at 4. At that time, Dr. Greer worked with plaintiff at Truesdale Hospital in Fall River. Greer Depo., Tab I at 11–15. Kay testified that in the course of her work as a

nurse, she had become aware that oral contraceptives sometimes induce a condition known as "pseudo-pregnancy," a condition in which non-pregnant women display symptoms of pregnancy, and that chloasma—a darkening of certain areas of the skin—sometimes occurs during pregnancy. Kay Depo., Tab D at 20–24, 32–33. However, she had never before used oral contraceptives herself, and when she first brought her condition to Dr. Greer's attention, she was concerned that she might have Addison's disease. Subsequent tests for Addison's disease were negative. *Id.* at 52–53.

Dr. Greer testified that Kay told him in an informal hospital encounter that she was concerned about the pigmentation problem, that she had read something in the package insert for Ortho Novum that indicated the Ortho Novum might be associated with the problem, and that she would like his advice as to whether the oral contraceptive might be the cause of this problem. Greer Depo., Tab I at 15–18. Dr. Greer "felt that it was a likely possibility" that her condition was related to her use of Ortho Novum (although he felt there were other possible causes as well), Greer Depo., Tab J at 4, and "told her it was a possible association, and ... suggested that she discuss it with her doctor who prescribed the medication [Dr. Friedman]...." Greer Depo., Tab I at 17. Dr. Greer never told Kay that the oral contraceptive was the cause of her pigmentation problem. Greer Depo., Tab J at 3.

Kay does not recall Dr. Greer characterizing Ortho Novum as a likely possible cause of her problem, but does acknowledge that he advised her to consult Dr. Friedman. Kay Depo., Tab D at 50–58. Kay then visited Dr. Friedman who, either alone or in consultation with Dr. Greer, diagnosed the problem as chloasma, a pigmentation disorder, and advised plaintiff to discontinue the contraceptive because of this condition. Plaintiff's Answer # 12 to Ortho Interrogatories, Tab C at 11. Dr.

---

**2.** Unless otherwise noted, all "Tab" references are to the Materials Submitted in Support of Defendants' Motion for Summary Judgment.

Hereinafter, all references to depositions are designated as "Depo."

Friedman's office note concerning Kay, dated May 15, 1967, states "Ortho Novum discontinued because of chloasma." Friedman Depo., Tab G at 25, 32, 40; Office Records of Dr. Friedman—Truesdale Clinic, Friedman Depo. Ex. 3, Tab H; Kay Depo., Tab D at 54–56; Greer Depo., Tab J at 6.

On the advice of Drs. Greer and Friedman, Kay discontinued using Ortho Novum around May 1967, and remained off the medication for approximately five or six months. Kay Depo., Tab D at 53–54. Rather than receding during this period, however, Kay's condition worsened, spreading to all areas of her body except her upper arms. *Id.* at 60. Plaintiff discussed with Dr. Friedman the fact that her pigmentation did not decrease after discontinuing Ortho Novum and told him that she wanted to resume the medication. *Id.* at 62–63. Dr. Friedman issued her a new prescription. Friedman Depo., Tab G at 32. Because of her fear of other possible side effects, including phlebitis and visual problems, plaintiff again discontinued using Ortho Novum in May 1968. Kay Depo., Tab D at 19–29, 65–66.

After Kay discontinued Ortho Novum in 1968, her hyperpigmentation continued to spread and become associated with other symptoms, including a burning sensation and a thickening of the skin. *Id.* at 69–70. Because the condition did not improve, Dr. Greer had discarded the theory that the contraceptive was the cause of her progressive pigmentation. Greer Depo., Tab J at 15–17. During the 1970s and early 1980s, Kay's condition was evaluated extensively by numerous physicians in a number of medical investigations coordinated by her personal physician, Dr. Greer, in an effort to determine the cause of her condition and an appropriate course of therapy. These evaluations included an examination by professors at Yale Medical School, *see* Letter dated March 25, 1969 from Dr. Braverman to Dr. Greer, Greer Depo. Ex. D, Tab L; extensive evaluations of Kay as a research patient at the Yale–New Haven Hospital in several separate admissions, *see* Yale–New Haven Discharge Summaries,

Tab E; Kay Depo., Tab D at 113; an evaluation by Milton Hamolsky, M.D., an endocrinologist, *see* Hamolsky Depo., Tab Q at 2–5, 11–12, 17–23; surgery by Toussaint LaClercq, M.D. of the Rhode Island Hospital for the removal of a suspected microadenoma (tumor of the pituitary gland), *see* LeClercq Depo., Tab R at 14–16; and three separate admissions as a research patient at the medical center of the National Institutes of Health (NIH) in Bethesda, Maryland, *see* NIH Reports dated August 17, 1979, October 6, 1980, and March 12, 1982, Greer Depo. Ex. H, Tab M. Kay was also under the care of Dr. Ira Rex, a dermatologist who practices at the Truesdale Hospital. Kay Depo., Tab D at 71–73; Rex Depo., Tab G of Materials Submitted by Plaintiff at 18, 24.

The medical records produced by these physicians and hospitals, and by plaintiff, indicate that they were aware that plaintiff was using oral contraceptives at the time her symptoms of spreading pigmentation first appeared. *See, e.g.*, Medical Records at Tabs E, M, S. Plaintiff testified at her deposition that she regularly informed her physicians of her oral contraceptive use because she considered it a "significant" aspect of her medical history. *See, e.g.*, Kay Depo., Tab D at 83–87, 89. None of these physicians were able to diagnose a cause for plaintiff's condition. *See, e.g.*, Medical Records at Tabs E, L and M; Rex Depo., Tab O at 18, 24. In 1974, plaintiff had discussions with personnel at the Yale–New Haven Hospital about resuming her use of oral contraceptives. Kay Depo., Tab D at 93–94. Although the cause of plaintiff's hyperpigmentation was listed as unknown when the plaintiff was evaluated at the NIH in July, 1979, (Records of NIH, Tab H of Materials Submitted by Plaintiff in Opposition to Defendants' Motion), the NIH ultimately diagnosed plaintiff as suffering from an extremely rare condition called "POEMS Syndrome," the cause of which was unknown. *Id.;* Greer Depo., Tab I at 50–52; Article by Morrow, et al., *POEMS Syndrome*, 142 Arch. of Intern. Med. 1231 (June, 1982), Greer Depo. Ex. I, Tab N.

Notwithstanding the inability of her physicians to identify the cause of her condition, during the 1970s and early 1980s (prior to April 1981), plaintiff had numerous discussions with Dr. Greer about the possibility of an association between her use of Ortho Novum and the hyperpigmentation. According to Dr. Greer "... it was her concern that she never really forgot the idea that this had begun while she was on oral contraceptives. I mean that was a common source of discussion." Greer Depo., Tab I at 19–20. Dr. Greer also testified that, "Mrs. Kay cannot get out of her mind that she started being pigmented when she was on Ortho Novum or on that medication. We had discarded that theory because the discontinuation of the medication was ineffective in arresting the problem. We were going ahead, with other possible causes and she would frequently hark back to Ortho Novum ..." Greer Depo., Tab J at 17. *See also id.* at 30–31, 35.

By the late 1970s, Kay had discussed with Dr. Greer the possibility of taking legal action to be compensated for her condition and had mentioned to Dr. Greer that he might be contacted by an attorney acting on her behalf concerning a possible lawsuit arising out of her use of the contraceptive medication. Greer Depo., Tab I at 25–26; Greer Depo., Tab J at 36–37. In the early part of 1981, Dr. Greer was told by Kay that he would be hearing from an attorney representing plaintiff in connection with possible legal action arising out of her use of oral contraceptives and her subsequent hyperpigmentation condition. Kay verbally authorized Dr. Greer to discuss her condition. Dr. Greer requested a written authorization and this authorization was received on May 4, 1981. Greer Depo., Tab I at 25–28; Greer Depo., Tab J at 36–37; Greer Depo. Ex. C, Tab K at 3.

Prior to receiving the written authorization, Dr. Greer received a letter dated April 23, 1981, from attorney John J. Mackin. This letter states:

Dear Dr. Greer,

I have been consulted by Martha Kay of Hood St., Fall River, in regards to a possible malpractice suit arising out of the use of certain medication which appears to have discolored her skin.

I do not know who prescribed this medication. If a doctor or hospital was negligent, suit must be commenced within three years of the occurrence of the act of negligence or within three years after the injured person discovers the cause of her injury. I am informed that this matter arose ten years ago.

Mrs. Kay informed me that you are willing to communicate with me and to express a medical opinion as to the cause of her difficulty and the negligence, if any, of any person or institution responsible for prescribing this medication.

May I request a response from you which I will be able to show to Ms. Kay in order to discuss the advisability of proceeding with this action.

Letter dated April 23, 1981 from John J. Mackin, Esq. to Dr. Greer, Greer Depo. Exh. C, Tab K at 2. It is undisputed that the referenced medication was Ortho Novum.

Dr. Greer responded to Attorney Mackin's inquiry with a letter dated April 29, 1981, in which he informed Attorney Mackin of the NIH's diagnosis of POEMS Syndrome and that he was unaware of any instance where oral contraceptives had been known to cause hyperpigmentation of the severity of that suffered by plaintiff. Greer Depo., Tab I at 27–28; Letter dated April 29, 1981 from Dr. Greer to John J. Mackin, Esq., Greer Depo. Ex. C, Tab K at 1.

In May 1982, Kay was referred by a second attorney, George Bolger, to Dr. Alan Balsam, a Boston physician. Plaintiff was associated with Bolger in connection with her action against a doctor who performed nasal reconstruction surgery on Kay in 1979. Kay Depo., Tab D at 127–29. During an office visit, Dr. Balsam took an oral history of Kay and performed a physical examination. He then reviewed certain records of plaintiff's prior extensive medical evaluations at Yale and the NIH. Based on the foregoing, Dr. Balsam issued a report to Attorney Bolger dated June 21,

1982, attributing Kay's hyperpigmentation condition to her use of oral contraceptives between 1966 and 1968. *See* Balsam Depo., Tab T at 30–42, 75–76; Letter dated June 21, 1982 from Dr. Balsam to George Bolger, Esq., Kay Depo. Exh. 2, Tab F.

Additional relevant facts are discussed in the following Conclusions of Law.

## II. CONCLUSIONS OF LAW

Defendants' motion for summary judgment is based on the contention that the undisputed facts demonstrate that plaintiff was on notice of the alleged causal relationship between Ortho Novum and her hyperpigmentation as early as 1967 and no later than April 1981. Once on notice that Ortho Novum was the likely cause of her problems, Kay had three years in which to investigate and file her claim against defendants. *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 199 (1st Cir.1983). According to defendants, the applicable statutes of limitations expired at least five months before the plaintiff filed her action.

Plaintiff responds that she was not on notice of the cause of her condition until at least June 1982, when Dr. Balsam issued his report unequivocally stating his opinion that plaintiff's severe pigmentary disorder was caused by her use of Ortho Novum.

### A. Summary Judgment Standard

As a threshold matter, the court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56(c), the court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In addition, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch*

*Transporation Corp.*, 722 F.2d 922, 928 (1st Cir.1983) (*citing Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)).

The question of the time at which the statute of limitations begins to run is a question for the court. *Olsen v. Bell Telephone Laboratories*, 388 Mass. 171, 174, 445 N.E.2d 609 (1983); *White v. Peabody Construction Corp.*, 386 Mass. 121, 128, 434 N.E.2d 1015 (1982). In many cases, this question has been found to be susceptible to resolution on a motion for summary judgment. *See e.g. Cornell v. E.I. Dupont DeNemours*, 841 F.2d 23 (1st Cir.1988); *Buckley v. American Honda Motor Co., Inc.*, 780 F.2d 1 (1st Cir.1985); *Fidler*, 714 F.2d at 192; *Lear–Heflich v. Schwartz*, 21 Mass.App.Ct. 928, 485 N.E.2d 692 (1985).

In *Fidler*, the Court of Appeals for the First Circuit described when summary judgment is appropriate concerning a statute of limitations defense, stating:

"Functionally the theory underlying a motion for summary judgment is essentially the same as the theory underlying a motion for directed verdict. The crux of both theories is that there is no genuine issue of material fact to be determined by the trier of fact, and that on the law applicable to the established facts, the movant is entitled to judgment" 6 Moore's Federal Practice ¶ 56.02[10], at 56–43. This is especially true where, as here, there has been a hearing on the summary judgment issue and a full development of relevant facts through deposition testimony. There is no dispute between the parties as to the essential evidentiary facts—what [plaintiff] was told at various times about her injuries and their cause—but only as to the ultimate conclusions to be drawn from these facts. But even such conclusions shall be left to the trier of fact "in all but the most exceptional cases." *Grigsby v. Sterling Drug, Inc.*, 428 F.Supp. 242, 243 (D.D.C.1975).

*Fidler*, 714 F.2d at 198.

Applying this standard to the instant case, the court concludes that defendants are entitled to summary judgment.

### B. *Statutes of Limitations: The Discovery Rule*

It is helpful to understanding the result in this case to recognize the purposes of statutes of limitations. A statute of limitations represents a legislative decision to restrict the amount of time that a plaintiff may wait to file suit after his or her cause of action accrues. The Supreme Court discussed the policy rationale for statutes of limitations in *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), a case involving the statute of limitations on the Federal Tort Claims Act:

> Statutes of limitations, which "are found and approved in all systems of enlightened jurisprudence," *Wood v. Carpenter*, 101 U.S. 135, 139 [25 L.Ed. 807] (1879), represent a prevasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that "the right to be free of stale claims in time comes to prevail over the right to prosecute them" *Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 349 [64 S.Ct. 582, 586, 88 L.Ed. 788] (1944). These enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise. (Citations omitted).
>
> Section 2401(b), the limitations provision involved here, is the balance struck by Congress in the context of tort claims against the Government; and we are not free to construe its so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims.

*Id.* 444 U.S. at 117, 100 S.Ct. at 356–57. *See also Olsen v. Bell Telephone Laboratories, Inc.*, 388 Mass. 171, 175, 445 N.E.2d 609 (1983) ("Statutes of limitations are 'vital to the welfare of society.... they promote repose by giving security and stability to human affairs....' [and] 'encourage plaintiffs to bring actions within prescribed deadlines when evidence is fresh and available'") (citations omitted).

State statutes of limitations apply to cases brought in federal court on the basis of diversity jurisdiction. *Guaranty Trust Company of New York v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). *See generally Buckley v. American Honda Motor Corp.*, 780 F.2d 1 (1st Cir.1985); *Fidler*, 714 F.2d at 196. As previously noted, two Massachusetts statutes of limitations govern the plaintiff's claims: the three-year statute of limitations for negligence claims, Mass.Gen.Laws c. 260, § 2A,[3] and the three-year statute of limitations for breach of warranty, Mass.Gen.Laws c. 106, § 2–318.[4] Plaintiffs have the burden of proving facts that show their claims are not barred by the statutes of limitations.

---

**3.** The statute of limitations for negligence claims reads as follows:

> Except as otherwise provided, actions of tort, actions of contract to recover for personal injuries, and actions of replevin, shall be commenced only within three years next after the cause of action accrues.

Mass.Gen.Laws c. 260, § 2A.

**4.** The statute of limitations for breach of warranty claims is contained in the general provisions for warranty actions:

> Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier might reasonably have expected to use, consume or be affected by the goods. The manufacturer, seller, lessor or supplier may not exclude or limit the operation of this section. Failure to give notice shall not bar recovery under this section unless the defendant proves that he was prejudiced thereby. *All actions under this section shall be commenced within three years next after the date the injury and damage occurs.*

Mass.Gen.Laws c. 106, § 2–318 (emphasis added).

*Franklin v. Albert,* 381 Mass. 611, 619, 411 N.E.2d 458 (1980).

In determining when a plaintiff's cause of action accrued in actions in which the plaintiff has been injured by the negligence of another, Massachusetts courts apply the so-called "discovery rule." Moreover, the First Circuit Court of Appeals has held that "the Supreme Judicial Court of Massachusetts would [also] apply the discovery rule to a products liability action ... brought under ... a breach of warranty theory." *Fidler,* 714 F.2d at 197. Therefore, the discovery rule governs the plaintiff's negligence and breach of warranty claims. *See also Fidler v. E.M. Parker, Co.,* 394 Mass. 534, 544–45, 476 N.E.2d 595 (1985).

Under the discovery rule, a plaintiff's cause of action does not accrue until he or she knows or reasonably should have known that he was injured as a result of the defendant's conduct. *Olsen,* 388 Mass. at 175, 445 N.E.2d 609. The plaintiff need not know the full extent of his injury or that the defendant is legally responsible. *Fidler,* 714 F.2d at 199. He need only be on notice that he has been harmed by the defendant's product. *Id.; Franklin,* 381 Mass. at 612, 411 N.E.2d 458 (medical malpractice case).

In addition, plaintiff's cause of action ordinarily accrues when he is on notice of a *likely,* rather than *definite,* cause of his injury. *Fidler,* 714 F.2d at 199. In *Fidler,* a products liability action involving the question of when the plaintiff was on notice of the cause of her crushing facial and head pains, the First Circuit Court of Appeals said:

We think that under Massachusetts law notice of *likely* cause is ordinarily enough to start the statute running. Thus on notice, the potential litigant *has the duty to discover from the legal, scientific, and medical communities* whether the theory of causation is supportable and whether it supports a legal claim. Thus on notice, his cause of action is no longer inherently unknowable. He is in the same position as other tort plaintiffs who must determine whether

the harm they have suffered is legally compensable. He has three years to do so.

*Fidler,* 714 F.2d at 199 (emphasis added).

As the First Circuit noted in *Fidler,* the Supreme Court has held that:

"A plaintiff ... armed with the facts about the harm done to him, can protect himself by seeking advice in the *medical and legal* community ... If advised that he has been wronged, he may promptly bring suit. If competently advised to the contrary, he may be dissuaded, as he should be, from pressing a baseless claim. Of course, he may be incompetently advised *or the medical community may be divided on [a] crucial issue ... But however or even whether he was advised, the putative ... plaintiff must determine within the period of limitations whether to sue or not, which is precisely the same judgment that other tort claimants must make."*

*Fidler,* 714 F.2d at 199 (quoting *United States v. Kubrick,* 444 U.S. 111, 123–24, 100 S.Ct. 352, 360, 62 L.Ed.2d 259 (1979)).

To start the statute running, a potential plaintiff need not know that a putative defendant has breached a legal duty to him or her, *Fidler,* 714 F.2d at 199, or that his or her injuries are legally compensable. *Cornell v. E.I. DuPont de Nemours & Co., Inc.,* 841 F.2d 23, 24 (1st Cir.1988). *See also Shea v. Keuffel & Essen of New Jersey,* 668 F.Supp. 41 (D.Mass.1986), *aff'd without op.,* 823 F.2d 543 (1987). Rather, as the Supreme Court suggested in *Kubrick,* a potential plaintiff with knowledge of the likely cause of his or her injuries has a duty to seek legal, as well as medical advice, within the period of limitations. Similarly, the mere fact that a potential plaintiff has not developed all of the evidence necessary to prove his or her case does not prevent the period of limitations from beginning or toll its expiration. "The 'notice' required is not notice of every fact which must be proved in support of the claim. These details are properly the subjects of requests for discovery once an action is filed." *White,* 386 Mass. at 121, 434 N.E.2d 1015.

As the First Circuit Court of Appeals has recognized, the foregoing principles may present difficult dilemmas for even the most diligent plaintiffs, particularly where the relevant medical or legal questions are most complex. Courts, including this court, are reluctant to encourage the hasty initiation of litigation upon unsupported speculation. However, as the First Circuit Court of Appeals has stated in language particularly meaningful for the instant case:

> Where a plaintiff, like appellant here, is unable despite due diligence to find authority to corroborate the suggested causation or to support legal liability, his claim may simply be inherently weak. In that case, there is no reason why the statute should not run. The plaintiff's failure to marshal support despite diligence may mean, however, that he has received poor medical, scientific or legal advice. The result is unfortunate but is also not a reason why the statute should not run; the same pitfall faces all plaintiffs, not just those whose causes of action are inherently difficult to discover. Certainly a litigant should not be discouraged from seeking additional professional opinion before rushing into court. But the claimant has the statutory period in which to do so. And a rule that starts the period running when the plaintiff is first put on notice of injury and cause rather than only when he has a basis to claim legal causation should not encourage the hasty filing of unsubstantiated legal claims, such claims being vulnerable to a motion to dismiss.

*Fidler*, 714 F.2d at 200.

### C. *Discovery Rule Applied to Kay's Claims*

■ In this case, even when the evidence is viewed in the light most favorable to plaintiff, the court concludes that it could not be properly found that Kay's cause of action accrued on or after October 17, 1981. Rather, it appears that here cause of action may have accrued as early as 1967 and, in any event, no later than April 21, 1981. By April 21, 1981, when the first attorney she consulted was investigating and evaluating her possible claim, Kay had sufficient notice that Ortho Novum had likely caused her injury. Thus, this action, filed on October 17, 1984, is barred by the three year statutes of limitations.

The undisputed evidence indicates that Kay became aware of a darkening in her skin in 1967, a few months after she began taking Ortho Novum. Thus, she had prompt notice of her injury.

The undisputed evidence also shows that Kay immediately considered the Ortho Novum as the cause of her problem. As a nurse, she knew that oral contraceptives sometimes caused symptoms associated with pregnancy, and that darkening of the skin is one such symptom. She also learned from the package insert for Ortho Novum that the product might be associated with pigmentation problems. Thus, in 1967, Kay sought medical advice concerning the effect that Ortho Novum was having on her.

Comparable information has been deemed sufficient to trigger the running of the limitation period. *See Pitts v. Aerolite SPE Corporation*, 673 F.Supp. 1123, 1128 (D.Mass.1987). In *Pitts*, one plaintiff "approached a physician with her belief that the insulation [at issue in the case] might have caused her family's illness." *Id.* at 1128. Although she was not given an answer by the doctor, and explored no further, the court found that the Pittses were on notice of the likely causal connection as of the time the doctor was consulted.

In the instant case, the initial advice Kay received from her doctors in 1967 further indicated that Ortho Novum was the likely cause of her problem. Dr. Friedman, either alone or in consultation with Dr. Greer, diagnosed her problem as chloasma and ordered her to discontinue the Ortho Novum.

■ It is true that ceasing to take the Ortho Novum did not cure Kay's condition. Rather, it got worse, causing Dr. Greer to retreat from his theory that the contraceptive was causing her problems. This, however, does not demonstrate that Kay was not put on notice earlier that she had a

duty to seek advice in the medical and legal communities regarding Ortho Novum. As the Court of Appeals found in *Fidler*, later, more doubtful, statements of opinion as to causation should not be taken into account in evaluating the import of earlier statements. 714 F.2d at 200. Otherwise, "the running of the limitations period would be subject to cancellation with every change in a doctor's thinking ... Any hope of repose would be illusory." *Id.*

In any event, Kay continued to investigate whether the Ortho Novum caused her problem. She was diligent in pursuing medical advice from highly reputable institutions. She always informed her doctors of her use of Ortho Novum, because it was to her a significant aspect of her medical history. Moreover, in her continuing discussions with Dr. Greer throughout the 1970's, she continued to associate her problems with Ortho Novum due to the problems' emergence shortly after she started taking the contraceptive.

These facts indicate that throughout the 1970's, Kay not only should have known, but actually did know, that she should investigate in the medical community whether the Ortho Novum had caused her problem. That investigation did not confirm or refute her theory that Ortho Novum was the source of her difficulties.

Kay was not as diligent about investigating her possible claim concerning Ortho Novum in the legal community. Nevertheless, it is clear that by the late 1970's, she recognized that she might have a legal claim concerning Ortho Novum. She discussed this with Dr. Greer and told the doctor he might soon be hearing from her attorney.

By April 1981, Kay was seriously exploring whether to bring suit concerning the Ortho Novum. This is most plainly reflected in the April 23, 1981 letter from her first attorney, Mackin, to Dr. Greer. By this time she had been "pointed toward the [alleged] relationship between [the] harm and [the product] to a degree sufficient to stimulate further inquiry." *Malapanis v. Shirazi*, 21 Mass.App.Ct. 378, 386, 487 N.E.2d 533 (1986). This is the essence of what is required to start the limitations period running. *Id.; Fidler*, 714 F.2d at 199.

Dr. Greer's response to Mackin did not suggest that a suit would be warranted or winnable. Kay was not required to rely upon the advice of Mackin or Dr. Greer. However, once on sufficient notice of the likely cause of her injury to be evaluating the possibility of suing the defendants in the instant case, she had an obligation to decide whether to bring that action within the three year limitations period.

Kay did consult another lawyer, George Bolger. Bolger referred Kay to Dr. Balsam in May 1981. In June 1981, Dr. Balsam informed Bolger and Kay of his opinion that the Ortho Novum caused Kay's pigmentation problem. Although there is no evidence in the record suggesting that further medical or legal investigation was done after June 1982, Kay waited more than two years before filing this action in October 1984. This was, of course, more than three years after her first attorney had started evaluating the potential suit. Thus, the generally applicable principles indicate that Kay's action is barred by the three-year statutes of limitations.

■ Kay, however, makes an additional argument which, upon examination, is also unmeritorious. In *Fidler*, the First Circuit Court of Appeals accepted in principle the theory that there may be cases in which the cause of a condition is unknowable until there is a scientific breakthrough, and the limitations period in such cases might not commence or expire until that breakthrough occurs. 714 F.2d at 200. As stated in *Fidler*:

[T]he state of medical or scientific knowledge may simply be such that causation of a plaintiff's harm is not sufficiently understood to support a legal claim. In such a case the plaintiff's diligence will be rewarded only after a breakthrough in scientific or medical understanding, and there is thus a rationale for delaying the running of the statute until after the breakthrough occurred. *See Stoleson v. United States*, 629 F.2d 1265, 1270–71

(7th Cir.1980) (thus distinguishing *Kubrick*).

*Id.* In *Fidler*, however, the Court of Appeals affirmed the ruling that summary judgment for the defendants was appropriate because there was inadequate evidence of a breakthrough. The same conclusion is compelled by the evidence in the instant case.

In the *Stoleson* case cited in *Fidler*, the plaintiff suspected that her heart problems were caused by nitroglycerin in her workplace. 629 F.2d at 1270. When she tried to confirm her suspicions, her doctor told her that "there is no medical evidence of a causal connection." *Id.* Several years later, another doctor "documented for the first time the relationship between occupational exposure to nitroglycerin and cardiovascular problems," and so informed Stoleson. *Id.* It was at this point that the Court of Appeals for the Seventh Circuit deemed the period of limitation to commence.

Even when viewed in the light most favorable to Kay, the evidence in the instant case is inadequate to establish the sort of breakthrough found in *Stoleson*.[5] In contrast to the situation in *Stoleson*, in 1982, neither Dr. Balsam, nor anyone else, did any new tests or made any scientific discoveries relating to Kay's condition. Rather, Dr. Balsam saw Kay at the request of an attorney contemplating litigation; reviewed her medical records; and examined her for one hour. Balsam Depo., Tab T at 35, 39. Dr. Balsam did not claim to base his conclusion that Ortho Novum caused Kay's problem on new information. Rath-

er, Dr. Balsam testified at his deposition that he considered a fair characterization of his analysis to be that he reviewed plaintiff's medical records from the Rhode Island Hospital, the National Institutes of Health and whatever other medical records she provided him; he took a family history orally from plaintiff and found that there was a temporal relationship between her use of the Pill and the onset of the condition; that she had no prior family history or personal history of a pigmentation problem; and that he had read that the birth control pill was related to chloasma and that chloasma is related to melasma and there was no evidence of any other possible cause. Therefore, he was left with the conclusion that the birth control pill was causing plaintiff's condition. Balsam Depo., Tab T at 75–76.

Dr. Balsam did not claim that there had been any recent breakthrough regarding what may have caused Kay's condition. To the contrary, in his report the doctor stated:

It is now *well recognized* that such severe pigmentary conditions may develop as a consequence of the use of birth control pills. At approximately the time the patient took the pill there appears to have been some indication in the prescribing information provided in the Physician's Desk Reference that dermatological complications of the pill could develop.

Report of Dr. Alan Balsam, Tab C of Materials Submitted by Plaintiff in Opposition to Defendant's Motion for Summary Judgment at 4 (emphasis added).[6]

---

5. This case is also factually distinguishable from *Harrison v. United States*, 708 F.2d 1023 (5th Cir.1983), in which the cause of plaintiff's injury was deemed unknowable to plaintiff and the doctors she consulted because of concealment of relevant medical records and affirmative misrepresentations by the doctors responsible for her injury.

6. In Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment, defendants quote deposition testimony of Dr. Balsam that amplifies the statement in his report regarding the information available when plaintiff started taking Ortho Novum. Defendants say that Dr. Balsam was asked whether he

was aware of any literature existing prior to 1968 that established a causal relationship between birth control pills and Kay's condition, and they represent that the doctor responded:

I'm not really able to cite the literature at this point. But my impression was there was such information available prior to '68. And that the cases I saw in the literature did date back to at least the '60s.

Defendants cite Dr. Balsam's deposition "Tab T, at 82–83" for this quote. These pages, however, are not in the materials submitted to the court. While the foregoing statement, if made, would reinforce the court's conclusion, the court has not relied upon it.

In view of the foregoing, it is undisputed that prior to 1968, medical literature discussed the possible causal relationship between birth control pills like Ortho Novum and Kay's condition; by 1982 the possible causal relationship was "well-known;" and Dr. Balsam did not make or rely upon any recent medical or scientific breakthrough in rendering his opinion. Rather, the evidence indicates only that in 1982, Kay finally found a doctor who was willing to give an opinion, based on information long available, that would support her potential lawsuit. Her second attorney brought suit more than two years later. This, however, is inadequate to save her case from being barred by the statutes of limitations. Once again, as the Court of Appeals said in *Fidler:*

> Where a plaintiff, [like Kay] is unable despite due diligence to find authority to corroborate the suggested causation or support legal liability, [her] claim may simply be inherently weak. In that case, there is no reason why the statute should not run. The plaintiff's failure to marshal support despite diligence, may mean, however, that he received poor medical, scientific, or legal advice. That result is unfortunate but is also no reason the statute should not run; the same pitfalls face all plaintiffs, not only those whose causes of action are inherently difficult to discover.

*Fidler,* 714 F.2d at 200.

III. CONCLUSION AND ORDER

Based on the foregoing analyses, the court concludes that Kay has failed to satisfy her burden of showing that her claims are not barred by the Massachusetts statutes of limitations. *Franklin,* 381 Mass. at 619, 411 N.E.2d 458. Kay knew at least by April 21, 1981, when her first attorney was investigating the matter, that Ortho Novum was a likely cause of her condition. Thus, she had until April 21, 1984 to bring this action. Having waited until October 17, 1984 to file her complaint, Kay's claims are barred.

In setting three-year statutes of limitations for negligence and breach of warranty actions, the Massachusetts General Court struck a balance between the need to provide plaintiffs with a judicial forum in which to litigate common law claims and the need to prevent the prosecution of stale claims. *See Olsen,* 388 Mass. at 175, 445 N.E.2d 609. *See also Kubrick,* 444 U.S. at 117, 100 S.Ct. at 356. The discovery rule is the result of the efforts of the Supreme Judicial Court of Massachusetts and the First Circuit Court of Appeals to interpret and apply these statutes of limitations faithfully. This court is, of course, required to implement these legislative and judicial judgments in the context of the facts of this case.

Accordingly, defendants' motion for summary judgment is hereby ALLOWED.