JUDITH LEAR-HEFLICH *vs.* PETER M. SCHWARTZ. November 21, 1985. *Limitations, Statute of. Doctor,* Duty to disclose to patient. *Negligence,* Medical malpractice.

Prior to December 21, 1977, the plaintiff used a Cu-7 intrauterine device (IUD) for contraception. This had been inserted by her former physician, who had told her to have it replaced within a specified time period. At the plaintiff's request the defendant physician removed the old device on December 21, 1977, and later inserted a new, similar IUD, on January 23, 1978. Thereafter the plaintiff suffered discomfort, and a third physician at her request removed the IUD on March 10, 1978. Her discomfort continued. She entered a hospital for a time. A doctor later informed her that she had pelvic inflammatory disease. On April 21, 1978, she went to another hospital, where she had a total hysterectomy.

This case[1] was commenced on April 4, 1983, about five years after the hysterectomy. The amended complaint alleged, among other matters, that the defendant "had a duty to . . . inform her of the risks . . . associated with the Cu-7 insofar as such risks . . . would be material to her decision to use the Cu-7" and that the defendant "failed . . . to inform her of such . . . risks . . . ." The defendant's answer contains a plea of the three-year statute of limitations. See G. L. c. 260, § 4, as appearing in St. 1981, c. 765. The case is before us on an appeal by the plaintiff from the allowance by a Superior Court judge of the defendant's motion for summary judgment.

In a deposition in this present case, the plaintiff testified in substance (see Appendix to this rescript) that, when the hysterectomy was performed, she thought there was a relationship between her pelvic inflammation and the new IUD and that she had talked about her situation with her father, a doctor specializing in urology. He had died in September, 1978. The plaintiff had testified on September 3, 1981, in her Federal court action (see note 1, *supra)* that her father had told her "there could be a correlation between" what she referred to as "the IUD causing the infection and [the] subsequent surgery." An affidavit in this case, apparently not disputed, shows that the plaintiff first consulted a Northampton attorney about this matter on April 6, 1980.[2]

In his memorandum and order granting summary judgment for the defendant, the motion judge recited portions of the testimony and affidavit mentioned above and in the Apppendix and concluded "on the basis of her own admissions, that . . . [the plaintiff] either knew or should have known that there was casual connection between the insertion of the device and her pelvic disease at the time of or shortly after her hysterectomy" and then "was aware of sufficient facts . . . to put a reasonable person on inquiry as to the existence . . . [or] non-existence of such a causal connection." The judge also concluded that it was not significant that the plaintiff "did not know at the time of the hysterectomy that the defendant had . . . information available to him when he inserted" the IUD about the risks attendant upon such a procedure. "The availability of such information to a physician was not a fact that was inherently unknowable. If in fact such information was available, reasonable inquiry would have revealed that . . . . The fact, if

---

[1] On November 25, 1980, the plaintiff had intiated an action in the United States District Court for the District of Massachusetts against the maufacturer of the IUD here involved.

[2] The motion judge had before him an affidavit by the plaintiff stating (a) that she had learned through discovery in the Federal action that the defendant "had available to him information regarding the risk of infection and sterility associated with" the IUD, (b) that she had not been warned by the defendant of that risk, and (c) that, prior to reviewing documents produced by the manufacturer, she "had no way of knowing what information should have been available to . . . [the defendant] and was therefore unaware that he had failed to inform . . . [her] of risks of which he knew or should have known."

it is a fact, that the plaintiff chose not to pursue such an inquiry should not toll the statute." The judge ruled that "[t]he statute of limitation started to run at the time of the hysterectomy . . . in April of 1978."

The judge stated correctly the applicable rule of law, viz., "that a cause of action for medical malpractice, including a cause of action based upon lack of informed consent, accrues when the plaintiff learns, or reasonably should have learned, that . . . she has been harmed as a result of the defendant's conduct." This is essentially the principle stated in *Franklin* v. *Albert*, 381 Mass. 611, 612 (1980), a case which also (at 619) held that, "even with the adoption of a discovery rule [for the commencement of the period within which an action must be brought], the plaintiff bears the burden of proving facts taking his [or her] case outside the impact of the three-year statute of limitations." See *Teller* v. *Schepens*, 381 Mass. 621, 622-623 (1980). See also *Hendrickson* v. *Sears*, 365 Mass. 83, 91 (1974).[3]

On the facts of the present case, we conclude that the motion judge correctly decided that, by the time the plaintiff had been the subject of at least two hospitalizations and a hysterectomy, she, as matter of law, was put on inquiry concerning her possible claims against the defendant. We regard the present case as within the principles discussed in *Gore* v. *Daniel O'Connell's Sons*, 17 Mass. App. Ct. 645, 647-649 (1984), and *Fidler* v. *Eastman Kodak Co.*, 714 F. 2d 192, 197-199 (1st Cir. 1983). In the *Fidler* case, the First Circuit, applying Massachusetts law, said (at 199), "[W]e find no indication in Massachusetts law that the notice necessary to start the statute [of limitations] running includes notice that [the] defendant has . . . [violated] a legal duty to [the] plaintiff." Later (also at 199), the opinion says, "[U]nder Massachusetts law notice of likely cause is ordinarily enough to start the statute running. Thus on notice, the potential litigant has the duty to discover from the legal, scientific, and medical communities whether the theory of causation is supportable and whether it supports a legal claim. Thus on notice, his cause of action is no longer inherently unknowable. He is in the same position as other tort plaintiffs who must determine whether the harm they have suffered is legally compensable. He has three years to do so."

*Judgment affirmed.*

---

[3] Issues concerning the claims of a plaintiff based on the absence of disclosure of risks inherent in medical procedures were dealt with in *Harnish* v. *Children's Hospital Medical Center*, 387 Mass. 152, 155-156 (1982), and *Halley* v. *Birbiglia*, 390 Mass. 540, 548 (1983). See and compare *Precourt* v. *Frederick*, 395 Mass. 689, 694-697, 700-705 (1985).

APPENDIX.

*Excerpts from Deposition of the Plaintiff, Taken January 25, 1984.*

"Q. [by the attorney] Did you feel that there was a connection between your second Cu-7 and your pelvic inflammatory disease? A. First, I must say I thought there was a connection between my first hospitalization and the second hospitalization. I felt it was very peculiar that once the Cu-7 was removed at my own request, the pain moved from the upper part of my body . . . down to the pelvic area radiating down my leg. I then thought that there was some connection between them. Q. After you had gone through your hysterectomy and your hospitalization at Baystate, did you still think there was a connection between your Cu-7 and your pelvic inflammatory disease? A. . . . I felt that there was a connection after I had had the hysterectomy. Q. Did you discuss that with anyone? A. I probably discussed it with my family and then I did go to see attorneys in Northampton. Q. First of all, with your family, who, in your family did you discuss it with? A. I would have discussed it with . . . my father . . . . He . . . felt that the two illnesses must have been related, that it would have been very unusual for a woman of my apparent good health to have two hospitalizations and two illnesses that weren't related. I believe that he did think there was an association, but I don't really remember the conversations any more."

*Donald M. Lubin* for the plaintiff.
*Francis D. Dibble, Jr. (Felicity Hardee* with him) for the defendant.