Rufo, Robert C., J.
INTRODUCTION
Plaintiff Paul Lavina (“Lavina”) filed this medical malpractice action against defendant Charles King, D.P.M. (“King”). This matter is before the court on King’s motion for summaiy judgment pursuant to Mass.R.Civ.P. 56 on statute of limitations grounds. For the reasons discussed below, the defendant’s motion for summaiy judgment is ALLOWED.
BACKGROUND
Viewed in the light most favorable to the plaintiff as the non-moving parly, the undisputed facts as revealed by the summaiy judgment record are as follows. Defendant Charles King (“King”) is a licensed podiatrist with an office in Brockton, Massachusetts. Approximately half of King’s patient population over the years has consisted of diabetics who often require *54 specific diabetic foot care. Lavina suffers from diabetes, hypertension, hyperlipidemia, and gross obesity. He began treatment with King in 1997, upon a referral from his primary care physician for diabetic foot care. On April 6-20, 1999, King admitted Lavina to Brockton Hospital for a right foot ulcer which required surgical debridement. On November 1-3, 1999, Lavina was admitted to Brockton Hospital with a left foot abscess requiring surgical debridement. Lavina was admitted to Brockton Hospital with right leg cellulitis on November 15-21, 2001 and again on March 21-25, 2002.
On July 18, 2005, Lavina, who was then 45 years old, saw King for a diabetic foot ulcer on the fifth metatarsal of his right foot. King prescribed antibiotics for the ulcer and suggested that Lavina cut out his sneaker in the area of concern. Between July of 2005 and April of 2006, Lavina saw King every six weeks and more frequently when problems arose. At these periodic visits, King informed Lavina that his foot ulcers and infections were the consequence of having diabetes, but reassured Lavina that the ulcer was healing and that he should continue to soak it, wrap it, and stay off his foot if possible. In September of 2005, King continued antibiotics and ordered a custom shoe for Lavina. In October of 2005, King observed that the ulcer had some bloody drainage and there was localized edema. He told Lavina to continue antibiotics and to continue gauze and saline twice daily. In November, King changed the antibiotic prescribed to Lavina.
In late January of 2006, the ulcer began to have an odor and appeared black, but King stated that the black part would just fall off. The ulcer hurt so much that Lavina requested painkillers for the first time. On April 1, King noted that the ulcer had not decreased in size and that the odor was still present. When Lavina visited his primary care physician on April 10, 2006, he reported that his right foot had been infected for one month. On April 15, King informed Lavina that his right foot was slightly infected in the bone and required scraping.
Lavina’s last office visit with King was on April 17, 2006. On that date, King was supposed to perform a scraping procedure on Lavina’s foot, but stated that he did not feel comfortable doing so at that time because King was leaving for a scheduled vacation. King admitted Lavina to Brockton Hospital with an infected right foot, wet gangrene, and osteomyelitis. Lavina underwent numerous tests, including vascular and radiology studies. On April 19, vascular surgeon Dr. Julie White performed a partial right foot amputation including the fourth and fifth toes. Lavina believed that this procedure was the inevitable consequence of his having diabetes. Dr. White told Lavina that the amputation was necessary because he had a gangrenous infection that went into the bone.
Lavina was discharged from Brockton Hospital on April 21, 2006 and began receiving home care from VNA of Cape Cod. On May 11, 2006, Lavina told his Harvard Vanguard nurse case manager, Aleñe Bonner, that he believed that the care he received from his treating podiatrist contributed to his amputation.
Lavina followed up with Dr. White. However, his foot did not heal properly and the infection progressed. He contracted a fever and was readmitted to Brockton Hospital on June 26, 2006, with redness and oozing in his foot. The same day, his foot and ankle were amputated. On June 30, Lavina was returned to the operating room for amputation of his right leg below the knee. Immediately following this surgery, Lavina saw other doctors who were critical of King’s treatment. According to Lavina, this led him to question for the first time whether the below the knee amputation was caused by substandard medical care, rather than the natural result of his diabetes. Lavina’s attorneys requested his medical records from King by letter dated March 7, 2007. Lavina retained an expert, podiatrist J. Christopher Connor, who prepared a February 19, 2009 report which states:
In my professional opinion, to a reasonable degree of medical certainty, the care and treatment rendered to Paul Lavina by podiatrist, Charles King, D.P.M. from July 2005 to April 2006 fell below the accepted standard of care for the average qualified podiatrist treating a diabetic foot ulcer when Dr. King failed to identify the presence of infection through culture and sensitivity of debrided tissue, when Dr. King failed to follow up on C&S results and document the organism present for appropriate antibiotic therapy, when Dr. King failed to recognize and appreciate when the initial antibiotic therapy was not effective, when Dr. King failed to order radiology studies sooner rather than later, when Dr. King failed to consult with a vascular surgeon for vascular studies and surgical consultation so that immediate attention could be given to stop the infectious process.
As a direct result of Dr. King’s deviation from the accepted standard of care as outlined above, Mr. Lavina required a below the knee amputation to stop the infectious process. Had Dr. King rendered care in accordance with accepted standard of care for the average qualified podiatrist treating a diabetic foot ulcer . . . more likely than not, Mr. Lavina would not have suffered an emergency guillotine amputation that later resulted in a below the knee amputation.
Lavina filed this action against King on June 2, 2009. Count I of the complaint alleges negligence, Count II alleges breach of warranty, Count III alleges failure to obtain informed consent, Count IV alleges infliction of emotional distress, and Count V seeks to recover for future medical expenses. In Count VI of the complaint, King’s wife asserts a claim of infliction of emotional distress, and in Count VII, she alleges loss of consortium.
*55 DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving parly to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
King contends that Lavina’s claims are barred by the relevant statutes of limitations. General Laws Chapter 260, Section 4 provides that actions of contract or tort for malpractice against a physician shall be commenced within three years after the cause of action accrues. In addition, General Laws Chapter 260, Section 2A provides that actions in tort shall be commenced within three years after the cause of action accrues. The general rule in tort actions is that a cause of action accrues when the plaintiff is injured. Koe v. Mercer, 450 Mass. 97, 101 (2007); Riley v. Presnell, 409 Mass. 239, 243 (1991).
However, under the so-called “discovery rule,” a cause of action for an inherently unknowable wrong accrues when the plaintiff discovers, or reasonably should have discovered, that he has been harmed or may have been harmed by the defendant’s conduct. See id. When a plaintiff invokes the discovery rule by claiming that his delay in filing suit stems from a failure to recognize the cause of his injury, he bears the burden of proving both an actual lack of causal knowledge and the objective reasonableness of that lack of knowledge. Koe v. Mercer, 450 Mass. at 101; Doe v. Creighton, 439 Mass. 281, 283 (2003). Generally, an issue concerning what the plaintiff knew or should have known is a factual question for a jury; however, in order to survive a summary judgment motion, the plaintiff must demonstrate a reasonable expectation of proving that his claim was timely filed by invoking facts which take his case outside the impact of the three-year statute of limitations. Koe v. Mercer, 450 Mass. at 101; Lear-Heflich v. Schwartz, 21 Mass.App.Ct. 928, 930, rev. den., 396 Mass. 1106 (1986). See also Castillo v. Massachusetts Gen. Hospital Chelsea Memorial Health Care Cntr., 38 Mass.App.Ct. 513, 516 (1995) (recognizing that summary judgment may be appropriately granted in medical malpractice case based on statute of limitations).
An action for medical malpractice accrues when a reasonably prudent person in the plaintiffs position, reacting to any suspicious circumstances of which he might have been aware, should have discovered that the medical care given by his physician may have caused his harm. Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 288 (2009); Lindsay v. Romano, 427 Mass. 771, 774 (1998); Bowen v. Eli Lilly & Co., Inc., 408 Mass. 204, 208 (1990). Certainty of causation is not required. Rather, notice of likely cause is sufficient to start the statute running, imposing on the potential litigant the duly to discover from the legal, scientific, and medical communities whether a theory of causation supports a legal claim. Bowen v. Eli Lilly & Co., Inc., 408 Mass. at 208; Fidler v. Eastman Kodak Co., 714 F.2d 192, 199 (1st Cir. 1983).
Here, as of April 19, 2006, Lavina knew that King had been treating him for an infected ulcer for several months and that despite said treatment, the infection had progressed to the point where the ulcer was painful, black, and malodorous. According to his surgeon, Dr. White, the infection had turned gangrenous, necessitating the amputation of part of his foot and two toes. Based on this information, as of May 11, 2006, Lavina had formed the opinion that King’s improper treatment of his ulcer contributed to the spread of the infection. Once Lavina formed a subjective belief that King’s conduct contributed to his in-juiy, his cause of action was no longer inherently unknowable.-[2]
The fact that no doctor expressly linked the injury to King’s care until after the below the knee amputation is irrelevant. Lavina’s subjective belief of causation placed him in the same position as other tort plaintiffs who must determine, after consultation with the relevant medical and scientific community, whether the harm they have suffered is legally com-pensable. See Lear-Heflich v. Schwartz, 21 Mass.App.Ct. at 929-30 (once plaintiff believed hysterectomy was connected to infection caused by IUD inserted by doctor, she was put on inquiiy as a matter of law concerning possible malpractice claim); Demetry v. First, 2005 Mass.Super. LEXIS 343 at *4-6 (July 19, 2005) (Kern, J.) (plaintiff who sought treatment for dog bite was on notice of cause of action against emergency room doctor one week later, when she developed gangrene in wound leading to permanent disfigurement and was dissatisfied with the treatment received); Martinez v. Sherwin-Williams Co., 1998 Mass.Super. LEXIS 307 at *14-16 (March 10, 1998) (Sosman, J.), affd, 50 Mass.App.Ct. 908, 908 (2000) (statute of limitations began to run when plaintiff formed subjective belief that exposure to defendants’ solvents caused her serious health problems, despite fact that medical professionals did not confirm causation until several years later). Cf. Donovan v. Philip Morris USA, Inc., 455 Mass. at 228 (noting that in complex toxic tort cases involving onset of *56 disease, notice of causation may not occur until plaintiff is so advised by physician); Lindsay v. Romano, 427 Mass. at 774-75 (accrual date of malpractice action was jury question where despite plaintiffs suspicion that surgery performed by defendant was cause of pain and other symptoms, seven other physicians were unable to determine cause of symptoms until eighth physician performed exploratory surgery and discovered infection caused by piece of surgical fabric left in patient’s body); Rawlston v. Whitten, 54 Mass.App.Ct. 1106 at *1-2 (2002) (Rule 1:28) (accrual date of malpractice action was jury question where although plaintiff suspected pain might have been caused by surgery, surgeon reassured her that pain was normal postoperative effect, and plaintiff did not learn otherwise until x-ray revealed a surgical clip left in her abdomen).
Lavina argues that “it is important to note that [he] is pursuing a claim for the loss of his leg below the knee. That injury did not happen until June 26, 2006. Therefore, it is impossible for the cause of action to have accrued before that time.” However, a plaintiff need not fully comprehend the full extent or nature of an injury in order for a cause of action to accrue. Koe v. Mercer, 450 Mass. at 102; Bowen v. Eli Lilly & Co., Inc., 408 Mass. at 207. All that is required to trigger the statute of limitations is the plaintiffs knowledge that the defendant has caused him appreciable harm. Ross v. Garabedian, 433 Mass. 360, 365 (2001); Massachusetts Elec. Co. v. Fletcher, Tilton & Whipple, P.C., 394 Mass. 265, 268 (1985). “If knowledge of the extent of the injury were to control the accrual of a cause of action, the fixed time period of statutes of limitations effectively would be destroyed.” Olsen v. Bell Telephone Laboratories, Inc., 388 Mass. 171, 175 (1983). See also Szymanski v. Boston Mut. Life Ins. Co., 56 Mass.App.Ct. 367, 369 n.3 (2002), rev. den., 438 Mass. 1106 (2003) (accrual of claim not postponed because of uncertainty about total extent of damages).
As conceded by Lavina in his brief, the negligence he alleges against King is the failure to “stop the infectious process.” As of May 11, 2006, Lavina knew that despite King’s treatment of the infection over the course of several months, the infection had progressed to the point that gangrene set in, requiring the amputation of two toes. This was appreciable harm to Lavina which caused his malpractice action to accrue. Once an injury becomes manifest, the statute of limitations does not stay in suspense until the full extent, gravity, or permanence of that same injury is known. Olsen v. Bell Telephone Laboratories, Inc., 388 Mass. at 175; Gore v. Daniel O’Connell’s Sons, Inc., 17 Mass.App.Ct. 645, 649 (1984). The unfortunate loss of Lavina’s leg below the knee due to the uncontrolled infection was simply a progression or aggravation of the earlier injury, rather than distinct harm which triggered the statute of limitations.[3] Cf. Doherty v. Admiral’s Flagship Condominium Trust, 80 Mass.App.Ct. 104, 109 n. 8 (2011) (because injury to health from toxic mold is-fundamentally different injury from property damage caused by initial water leaks in unit, cause of action did not accrue until plaintiffs learned of presence of mold).
Thus, Lavina has no reasonable expectation of proving that his malpractice claim was timely filed because he cannot meet his burden to prove an actual lack of causal knowledge prior to June of 2006. Based on the undisputed evidence in the summary judgment record, Lavina was on notice as of May 11, 2006 that King’s treatment of his infection was the likely cause of the need for amputation. Accordingly, his malpractice claim accrued on that date, rendering the filing of this lawsuit on June 2, 2009 untimely.[4]
ORDER
For the foregoing reasons, it is hereby ORDERED that Defendant Charles King, D.P.M.’s Motion for Summary Judgment be ALLOWED.

This is true despite Lavina’s general belief that diabetes may inevitably result in the loss of extremities. Previously, Lavina had been treated successfully for infected foot ulcers without the necessity of amputation. More importantly, as of May 11, he actually believed that the quality of care provided by King contributed to the loss of his toes.

Indeed, Lavina’s medical expert links the two injuries, opining that had King not been negligent in the treatment of the ulcer, Lavina “would not have suffered an emergency guillotine amputation that later resulted in a below the knee amputation.”

Moreover, a reasonably prudent person in Lavina’s position would be on notice prior to the June 26, 2006 surgery of a likely connection between King’s treatment of the infected ulcer and the onset of gangrene necessitating the amputation of two toes.